**Stephen J. Joncus**, OSB No. 013072
JONCUS LAW LLC
P.O. Box 838
Clackamas, Oregon 97015
917.236.1200
steve@joncus.net

**Andrew E. Aubertine**, OSB No. 830130
AUBERTINE LAW GROUP PC
7128 SW Gonzaga Street, Suite 230
Portland, Oregon 97223
503.221.2333
aa@aubertinelaw.com

*Attorneys for Plaintiff*
*BOYDSTUN EQUIPMENT*
*MANUFACTURING, LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **BOYDSTUN EQUIPMENT MANUFACTURING, LLC**, an Oregon limited liability company,<br><br>        Plaintiff,<br><br>   v.<br><br>**COTTRELL, INC.**, a Georgia corporation,<br><br>        Defendant. | 3:16-cv-790-SI<br><br><br>**THIRD AMENDED COMPLAINT FOR ANTITRUST CLAIMS UNDER FEDERAL AND STATE LAW AND DECLARATORY JUDGMENT OF PATENT NON-INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Boydstun Equipment Manufacturing, LLC ("Boydstun" or "Plaintiff") brings this action against Defendant Cottrell, Inc. ("Cottrell") and complains as follows:

## NATURE OF THE ACTION

1.      This is an action arising under section 2 of the Sherman Act, 15 USC §2 and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26 whereby Plaintiff alleges that Cottrell violated Section 2 of the Sherman Act and Section 4 of the Clayton Act.

2.      This is also an action arising under the Oregon Antitrust Act, Oregon Revised Statute (ORS) 646.730, 646.770, and 646.780 whereby Plaintiff alleges that Cottrell violated ORS 646.730 of the Oregon Antitrust Act.

3.      This is also an action for bad faith enforcement of patents in violation of Oregon Revised Statute (ORS) § 646A.810.

4.      This is also an action for a declaratory judgment that Boydstun does not infringe any claim of the '140 ratchet winch patent. A true and correct copy of the '140 ratchet winch patent is attached as Exhibit A.

5.      Plaintiff Boydstun is a limited liability company organized under the laws of the state of Oregon with its principle place of business at 8811 SE Herbert Court, Clackamas, Oregon 97015. Plaintiff manufacturers and sells commercial car haulers, regularly conducts business in the State of Oregon, and sells its product in this District. During the relevant period, Plaintiff suffered antitrust injury as a result of the anticompetitive conduct alleged herein, which is ongoing.

6.      Defendant Cottrell, Inc. is a corporation organized under the laws of Georgia, with its principle place of business at 2125 Candler Road, Gainesville, Georgia 30507.  Cottrell

manufacturers and sells commercial car haulers, regularly conducts business in the State of Oregon, and sells its product in this District.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1337(a) because this is a civil action arising under the antitrust laws of the United States, Section 2 of the Sherman Act and Section 4 of the Clayton Act.

8.      This Complaint is brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. Declaratory judgment jurisdiction is proper because there is a case or controversy between Boydstun and Cottrell.

9.      Jurisdiction is proper in this Court pursuant to 28 §§ U.S.C. 1331 and 1338(a), because this action arises under the patent laws of the United States.

10.      The Court has personal jurisdiction over Cottrell. Cottrell is the largest seller of commercial car haulers in the State of Oregon.  Cottrell maintains continuous and systematic contacts with this judicial district and regularly conducts business within this judicial district. Cottrell continuously markets and sells commercial car haulers in Oregon.

11.      TEC Equipment Auto Transport Sales, located at 9414 NE Vancouver Way, Portland, Oregon ("TEC Equipment") is an authorized dealer of Cottrell commercial car haulers.

12.      On information and belief, TEC Equipment is one of the largest authorized Cottrell dealers in the United States. In addition to being an authorized sales agent of Cottrell, TEC Equipment is also an authorized supplier of Cottrell parts and a Cottrell Authorized Warranty Repair Center.

13.      Venue is proper in this Court pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22, because Cottrell is found and/or transacts business in the State of Oregon and in this

judicial district and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

14.     Venue is also proper pursuant to 28 U.S.C. § 1391.

## TRADE AND COMMERCE

15.     Commercial car haulers is the product at issue in this case, such products are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

## SUMMARY OF CASE

16.     Cottrell is in the business of manufacturing commercial car haulers and competes for the sale of commercial car haulers with Plaintiff Boydstun.

17.     Cottrell has a monopoly and possesses market power in the relevant product market, as it has approximately 95% of the market.

18.     Cottrell has abused its market power to drive competitors out of the market, neutralize competitors from being able to effectively compete against Cottrell, and/or delay and impede competitors' growth, which stifles competition in the relevant market.

19.     Cottrell's willful and exclusionary conduct includes, but is not limited to, wrongful and meritless assertions of patent infringement claims against Boydstun and other competitors that are made in bad faith and by other means described herein.  This conduct has the purpose and/or effect of unlawfully undermining competition generally, undermining Boydstun's ability to compete, and interfering with Boydstun's business relationships with actual and potential customers and suppliers.

20.     Through the threat of enforcing invalid patents, Cottrell has successfully managed to prevent its competitors from using more innovative features that are needed to effectively

compete for the sale of commercial car haulers, block choices of products to customers, and scare customers into choosing to buy from Cottrell rather than other competitors, including Boydstun.  Cottrell also employs its market power in other anticompetitive and exclusionary ways as described herein as part of an ongoing pattern to keep its rivals in their infancy and block and/or deter their growth so as not to pose a threat to Cottrell's market share and allow Cottrell to maintain its monopoly in the relevant market.

21.    Cottrell has and continues to target Boydstun with the same exclusionary conduct and means for the same anticompetitive purposes regarding Boydstun's product as Cottrell has done to other manufacturers.

22.    Cottrell's conduct, left unchecked, will allow Cottrell to unlawfully maintain its monopoly in the relevant market, stifle innovation, limit choice to customers, chill price competition, and prevent customers from having the option of buying and using the highest quality commercial car hauler to fit their specific desires and needs.

23.    Cottrell's conduct has damaged Boydstun's business and property and, if left unchecked and without injunctive relief, Cottrell's conduct threatens to and will cause further damage to Boydstun's business and property.  Boydstun seeks treble damages, injunctive relief, and reimbursement of attorney fees and costs, as alleged herein.

## **RELEVANT MARKETS**

### The Relevant Product Market – Commercial Car Haulers

24.    The relevant product market is commercial car haulers within the meaning of the Sherman Act and the Clayton Act.

25.     A commercial car hauler is a type of large-sized vehicle that is designed and manufactured specifically and solely to transport new and used automobiles and other motor-driven vehicles.

26.     Commercial car haulers are typically 18-wheel articulated vehicles that are capable of carrying up to ten automobiles per trip.

27.     There are approximately Fifteen Thousand (15,000) commercial car haulers operating in the United States.

28.     Commercial car haulers are indispensable for the transportation of new and used automobiles from a point of pick up to the ultimate destination which is, in most instances, auto dealerships.

29.     Commercial car haulers are distinct products.  Other modes of transporting cars are not cost-efficient or efficient substitutes for commercial car haulers. For example, trains can be used to transport cars over long distances, but have fixed delivery points. Commercial car haulers are the only means of transporting cars in volume to local dealerships and are often used to transport cars for many hundreds of miles.

30.     While in operation, a commercial car hauler requires a driver to load and unload automobiles and drive the vehicle from place to place ("Drivers").

31.     Commercial car haulers are only useful for transporting automobiles and they are designed and manufactured solely for that purpose. Other freight-type vehicles cannot be converted to serve as commercial car haulers.

32.     No customer, described herein, will buy a converted truck instead of the commercial car hauler for the purpose of transporting automobiles.

33.    Instead, manufacturers of commercial car haulers customize a truck chassis obtained from a truck chassis manufacturer with a headrack and other modifications; and build a custom trailer that attaches to the truck chassis. The design, construction, and assembly of a commercial car hauler involves many specialized equipment components that are built into the truck chassis and the trailer.

34.    These specialized components are essential to the utility of the vehicle functioning as a commercial car hauler.

35.    These specialized components are not sold separately; they are integrated into the design of the commercial car hauler as essential components providing essential functions.

36.    Some of these specialized components include patented features.

37.    These specialized components, in combination with the unique designs and use of the commercial car haulers, are what allow manufacturers such as Boydstun to compete in the relevant product market for the sales of commercial car haulers and offer more product and product design choices to customers.  Without such components, the commercial car hauler cannot be used as intended, the commercial car hauler manufacturer cannot effectively compete in the market, and the quality of products available in the market is reduced.

38.    For example, a tie-down component to fasten cars to the car hauler is essential to the use and operation of a commercial car hauler.

39.    A commercial car hauler manufacturer that cannot offer a strap tie-down system cannot effectively compete in the commercial car hauler sales market.    The strap tie-down system allows for cars to be fastened to a car hauler by means of straps over the tires. Strap tie-downs are a major improvement over the previous method that used chains hooked to the frame of each car.

40.     Similarly, a ratcheting winch for the tie-down system is becoming an industry standard feature on commercial car haulers. The ratcheting winch permits a Driver to tighten a strap with a reciprocating up and down motion without having to remove the bar from the winch head.

41.     A commercial car hauler manufacturer that cannot offer a ratcheting winch feature cannot effectively compete in the commercial car hauler sales market.

42.     Because manufacturers use and rely on the specialized components to compete for the sales of commercial car haulers, a threat that may block the use of these specialized components can substantially interfere with, undermine, and even eliminate competitor's ability to effectively compete for sales of commercial car haulers.

43.     The truck chassis is another essential feature of the commercial car hauler. Truck chassis are manufactured and delivered to the car hauler manufacturer. Truck chassis can be purchased directly from the truck chassis dealer, for example, Freightliner, and then directed to the commercial car hauler manufacturer (commonly known as the "body/trailer builder"). Truck chassis can also be purchased by independent dealers that represent the body/trailer builder. The truck chassis can also be purchased by the body/trailer builder and held on the truck chassis dealer's flooring line. This allows truck chassis to be immediately available for customers who need to act quickly. The truck chassis are then modified and adapted for the particular car hauler design created by the commercial car hauler manufacturer.

<u>The Relevant Geographic Market is the United States</u>

44.     The relevant geographic market is the United States within the meaning of the Sherman Act and Clayton Act.

45.     Cottrell, Boydstun and their competitors sell their commercial car haulers across the United States.  A customer in any region of the United States make buying decisions with little consideration of the location of the U.S. manufacturer.

46.     There are no known foreign commercial car hauler manufacturers that sell their products in the United States. Faced with significant price increases over the past seven years, commercial car hauler customers have not turned to manufacturers outside of the United States for their supply. Foreign commercial car hauler manufacturers have not made any known sales in the United States in the past seven years despite customer price increases of up to twenty percent (20%) or more for commercial car haulers in the United States between 2010 and 2014.

<u>Customers</u>

47.     There are two types of customers that buy commercial car haulers from manufacturers: (1) companies in the business of transporting automobiles using their own fleet of commercial car hauler ("Fleet Owners") and (2) companies that own and drive the commercial car haulers ("Owner-Operator").

48.     Owner-Operators can work independently or work for a Fleet Owner.

49.     Because Fleets and Owner Operators use and rely on the specialized components in operating the commercial car haulers, a threat that may block the use of these specialized components can substantially interfere with a Fleet's or Owner Operator's ability to effectively compete in the market to transport automobiles.

50.     A threat of a patent litigation—even involving patents of highly questionable validity—is effective in chilling demand for commercial car haulers having the accused feature because customers do not want to leave themselves open to an infringement lawsuit or other consequences.

51.     The threat is exacerbated by the fact that a substantial amount of money is involved when a customer buys a commercial car hauler; each commercial car hauler, including the truck chassis, can cost up to $300,000.

Dealers

52.     Dealers are business entities that sell commercial car haulers to customers, including to Fleet Owners and Owner-Operators. Dealers represent an opportunity to showcase, market, promote and sell commercial car hauler manufacturers' products. The Dealers in most instances receive compensation for selling the commercial car haulers. Dealers are good at dealing with financing, trade-ins, refurbishment that customers may need. Dealers also take additional risk on providing financing by taking their own risk to provide financing to customers who may not have good credit.

Sales in the Relevant Market

53.     The United States commercial car hauler sales market, without considering the value of the truck chassis, is a Two Hundred and Sixty Million Dollar ($260 million) per year industry.

54.     Approximately 2000 commercial car haulers were manufactured in the United States each year in 2014, 2015, and 2016.

55.     Sales of commercial car haulers in the United are projected to grow.

56.     The United States fleet is old and worn-out and will be replaced with newer units.

57.     Many commercial car haulers trucks do not comply with U.S. emissions standards and are in need of replacement to improve efficiency and reduce emissions and maintenance costs.

58.    Recent changes in federal regulations, now allow commercial car haulers to be five (5) feet longer, thereby increasing capacity. Fleet Owners and Owner-Operators will take advantage of this rule change to modernize their aging inventory of commercial car haulers. Existing commercial car hauler units will be replaced with the newer units.

## DEFENDANT'S MARKET POWER

59.    At all relevant times, Defendant Cottrell has had 95% or greater market share of the commercial car hauler sales market in the United States.

60.    At all relevant times, Defendant Cottrell has possessed monopoly power and market power, *i.e.* the ability to raise prices significantly without losing significant sales and the ability to exclude competitors from the market.

61.    As of 2010 and at all times thereafter, Cottrell had and still has at least 95% of the commercial car hauler sales market.

62.    By way of example of Cottrell's market power, between 2010 and 2014, the prices for commercial car haulers increased by up to 20% or even more in some instances. However, during that same time period, Cottrell had not lost any market share as a result of the price increases and it has been able to maintain its prices at the higher levels.

63.    Between 2010 to the present, only three companies entered into the market: AutoMax Trailers, Inc. ("AutoMax") in 2012, Miller Manufacturing ("Miller") in or around July 2013 by virtue of a joint venture, described below, and Boydstun in 2014.

64.    Miller left the market less than a year after it started leaving Boydstun and AutoMax as the only new market entrants since 2009 that are still competing in the commercial car hauler market.

## ENTRY & EXPANSION BARRIERS

65.    Successful entry and the ability to sustain a competitive presence in the market is expensive, takes substantial time prior to entry, and is limited to those companies that can demonstrate expertise in the industry and a history of building and selling reliable vehicles.

66.    It takes many millions of dollars to enter into the market with sufficient scale to manufacture and sell commercial car haulers.

67.    Unless a company acquires a current competitor, the start-up time between deciding to enter into the commercial car hauler market and entry is more than a year.

68.    A new entrant, unknown in the industry, encounters even more obstacles before it could present a viable competitive threat. Because commercial car haulers are highly specialized and complicated products, a new entrant must be able to demonstrate to its potential customers that it has significant expertise in manufacturing commercial car haulers before a customer will buy in significant quantities from the new entrant.

69.    Only those companies that have developed a reputation for producing a viable alternative and that have created relationships with vendors and customers in the industry have a chance to break into the market and make sales to customers.

70.     Therefore, the business relationship between seller and buyer in the commercial car hauler sales market is critical to seller's success and any interference with that relationship can deal a staggering if not fatal blow to the seller.

71.    Prices on commercial car haulers increased after Boydstun Metal Works exit from the market, in some cases by more than 20%. Despite these price increase described herein, there are only two competitors in the commercial car hauler market today that have more than 1% market share in the United States:  Cottrell has approximately 95% of the commercial car hauler

sales market, Boydstun Equipment Manufacturing has approximately 3-4% of the commercial car hauler sales market, and Delavan and several other smaller companies collectively have less than 1-2% of the commercial car hauler sales market.

72.     Twenty-five years ago, at least ten manufacturers were competing in the commercial car hauler sales market.

73.     As of 1996, Bankhead Manufacturing and Boydstun Metal Works, a separate company that Rob Boydstun formed,[1] were Cottrell's primary competition for the sale of commercial car haulers.

74.     Cottrell acquired Bankhead Manufacturing in 1996. Boydstun Metal Works' market share was, at that time, approximately 10-15% of the relevant market.

75.     By 2008, Cottrell had approximately 50% of the market, Boydstun Metal's market share had grown to approximately 45% of the market, and the remaining companies collectively had approximately 5% of the market.

76.     Boydstun's increased market share was all due to growth; none of it was due to acquisition.

77.     Boydstun Metal Works left the market in 2009 at which point Cottrell became almost the sole supplier of commercial car haulers to Fleets and Owner Operators in the United States.

78.     Sophisticated companies with significant capital have tried to enter the commercial car hauler sales market and failed.

_____

[1] Rob Boydstun was the Founder and President of Boydstun Metal Works. Boydstun Metal Works manufactured commercial car haulers from 1989 to 2009 and left the market in 2009.

79.     Miller, a manufacturer of light duty towing and recovery vehicles with annual sales of $450 million, attempted to enter the relevant market in the second half of 2013 by entering into a joint venture with Lohr Group, a private French corporation and one of the world's largest commercial car hauler manufacturers ("Lohr"), to operate Lohr's subsidiary, Delavan Automotive ("Delavan"), to manufacture commercial car haulers in the United States.

80.     Despite Miller being a $450 million company and already having substantial size and experience in the light-duty tow truck market (a separate market), its investment failed after less than a year. Miller lost over a million dollars and sold its joint venture share in Delavan back to Lohr in 2014.

81.     Lohr is the largest manufacturer of commercial car haulers in the world. However, Lohr's U.S. subsidiary, Delavan, has not succeeded in capturing market share and taking sales from Cottrell. Delavan's sales amount to approximately 1% or less of the United States market for commercial car hauler sales over the last six years.

<u>Plaintiff Enters the Market and Presents a New Competitive Threat</u>

82.     Boydstun Equipment Manufacturing entered the commercial car hauler sales market in late 2014. Rob Boydstun is the Founder and President of Boydstun Equipment Manufacturing.

83.     Cottrell was well-aware of Rob Boydstun's experience in manufacturing commercial car haulers and his success with his previous company, Boydstun Metal Works.

84.     By the end of 2015, Boydstun had sold approximately 50 commercial car haulers and captured approximately 3% of the market.  Boydstun was poised to replicate the growth that Boydstun Metal Works had previously experienced.

85.   Boydstun has and had shown that it can compete in head-to-head competition with Cottrell in product offerings, designs, and manufacturing expertise, by offering a higher quality product as a competitive alternative to what Cottrell offers.

86.   Prices for commercial car haulers stabilized and have not increased since Boydstun entered into the market in 2014.

87.   Cottrell became concerned that Boydstun represented a serious competitive threat based on their past history in the market and Boydstun's early success in 2015.

88.   Cottrell knew that it could not compete with Boydstun on quality or innovation and would continue to lose market share to Boydstun unless Cottrell took action intended to interfere with, impede, and undermine Boydstun's ability to compete and marginalize Boydstun's competitive impact in the relevant market.

89.   Cottrell chose to use the same exclusionary and unlawful tactics against Boydstun that it had successfully used against other competitors to prevent further erosion of its market share: threaten litigation of and otherwise attempt to leverage a patent that had been obtained in bad faith, engage in a scare-the-customer tactic in the process, block or reduce a rival from increased product visibility and showcasing in the market, and interfere with Boydstun's ability to acquire key components to build the Boydstun commercial car haulers.

**WILLFUL MONOPOLY MAINTENANCE - EXCLUSIONARY CONDUCT**

Bad Faith Enforcement of Invalid Patents

90.   Cottrell obtained patents on two essential features of a commercial car hauler through fraud–the soft-tie system and the ratcheting winch—and is now using those patents to block and attempt to block Boydstun's ability to compete with Cottrell by threatening to bring patent infringement actions against Boydstun based on the invalid patents.

91.    Cottrell's threats are made in bad faith and are made to intimidate Plaintiff into giving up use of its lawful manufacture and sale of the Boydstun's soft tie system and Rapid Ratchet™ winch, which, had Plaintiff done that, would have forced Plaintiff to sell an inferior product and effectively neutralize Plaintiff's competitive threat to Cottrell in the relevant market.

92.    Cottrell made its bad faith threats for the specific purposes of interfering with and crippling Boydstun's ability to compete with Cottrell and interfering with Plaintiff's actual and potential customers.  By making these threats, Cottrell intended to undermine and/or drive out of business the only entity that poses a serious and significant competitive threat to Cottrell for the purpose of maintaining its monopoly in the commercial car hauler sales market.

93.    The two patents at issue are U.S. Pat. No. 7,484,917 ("the '917 soft-tie patent") and U.S.  7,585,140 ("the '140 ratcheting-winch patent).

<u>The '917 Patent</u>

94.    Cottrell obtained the '917 patent by failing to properly inform and advise the Patent Office of material information of which Cottrell was aware, namely Boydstun Metal Works' prior invention of US Pat. No. 7,114,897 ("the Boydstun soft-tie patent"), Boydstun Metal Works' patent infringement lawsuit against Cottrell for infringement of the Boydstun soft-tie patent, ███████████████████████████████████████████████████████████
███████████████████████████████████████████████.

95.    Cottrell's '917 patent claims the same subject matter that is disclosed in the Boydstun soft-tie patent.

96.    Cottrell has had a history of copying innovations from Boydstun Metal Works. For instance, Cottrell copied features from Boydstun Metal Works' designs including screw actuators, articulating deck, extend/ dump valves, air operated scale gauges, extendable ICC light

bar, removable aluminum ladder, and sliding king ping. In 2006 and 2007, Boydstun Metal Works was also suing Cottrell for infringement of U.S. Patent No. 7,025,547 (the "Boydstun screw-actuator patent"). On information and belief, Cottrell learned about Boydstun Metal Works' new soft-tie system during Boydstun Metal Works' development process and copied it.

97.    Cottrell filed a provisional application on May 17, 2005 entitled "Strap Tie Down Apparatus and System." On May 25, 2005 Boydstun Metal Works filed its utility application for the Boydstun soft-tie patent on entitled "Vehicle Support and Retention System for a Vehicle Transporter." Cottrell filed its utility application for the '917 patent on January 18, 2006. The Boydstun soft-tie patent issued on October 3, 2006 and on the same day Boydstun Metal Works sued Cottrell for infringement of the Boydstun soft-tie patent. The claims of the Boydstun soft-tie patent and the claims that Cottrell was seeking in its '917 patent application cover essentially the same scope. The '917 patent did not issue until February 3, 2009.

98.    Cottrell was infringing the Boydstun soft-tie patent. During the period of time from October 3, 2006 ███████████████████, Cottrell was prosecuting the '917 patent at the same time it was being sued by Boydstun Metal Works for infringement of Boydstun Metal Works' soft-tie patent on the same device that it was seeking to patent.

99.    During the fourteen (14) months of litigation over the Boydstun soft-tie patent, Cottrell received discovery from Boydstun Metal Works showing that Boydstun Metal Works was the first to invent the soft-tie technology for car haulers. Cottrell also knew about the cited prior art listed on the face of the Boydstun soft-tie patent during prosecution of its '917 patent.

100.    Cottrell was fully aware that Boydstun Metal Works developed the soft-tie technology prior to Cottrell's alleged invention of the '917 soft-tie patent. At no time during the litigation did Cottrell provide information of any alleged prior invention of the soft-tie tie-down

winch. Cottrell was specifically asked in an interrogatory if it possessed any information about prior invention by someone else of any invention claimed in the Boydstun soft-tie patent. Cottrell did not provide a substantive response. Cottrell was asked in an interrogatory in this case to describe its history of conception, development, and reduction to practice of the soft-tie patent. The only information provided by Cottrell was the date of its constructive reduction to practice when it filed its provisional patent application on May 17, 2005. Cottrell provided no information about the timeframe in which it alleges that it actually conceived and reduced the '917 patent to practice.

101.



102.

103.    Cottrell was sued for infringement of the Boydstun soft-tie patent. Cottrell knew from the outset of the litigation that it had secretly filed its provisional application for its purported invention of the same system 8 days earlier than the filing date for the Boydstun soft-tie patent. Because provisional applications are not public, Boydstun Metal Works was unaware of Cottrell's provisional application—but Cottrell knew that its application was 8 days earlier than Boydstun's. In discovery, Cottrell learned when Boydstun had conceived and reduced its

soft-tie invention to practice. Yet, when specifically asked in discovery about any earlier development by Cottrell of a soft-tie invention, and having the obligation to provide responsive information, Cottrell refused to answer the question. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

104.    ████████████████████████████████████████

████████████████████████████████████████████████████

████    During the entire time that it prosecuted the '917 patent, Cottrell had a duty to disclose information material to the patentability of its application for the '917 patent. The Patent Office imposes a duty of candor and good faith on patent applicants. This duty requires disclosure of any information known to the applicant that is material to the patentability of the claimed invention.

105.    Cottrell failed to disclose to the Patent Office: the Boydstun soft-tie patent, information that it had about Boydstun Metal Works' prior invention, prior art listed on the Boydstun soft-tie patent, the patent infringement lawsuit filed by Boydstun Metal Works against Cottrell, ████████████████████████████████████████████████

████████    Indeed, Cottrell never took any action to satisfy its duty of disclosure during the prosecution of the '917 soft-tie patent, because it never filed an Information Disclosure Statement ("IDS") with the Patent Office at any point during the prosecution of the '917 soft-tie patent.

106.    Cottrell knew that it did not invent the subject matter of the '917 patent and that it had copied the soft-tie design from Boydstun. These facts show that Cottrell failed to satisfy its duty to the Patent Office and acted with specific intent to deceive the Patent Office.

107.    The Boydstun Metal Works development of the Boydstun soft-tie patent, the lawsuit against Cottrell asserting infringement of the Boydstun soft-tie patent, ████████████ ████████████████████████████████████████████████████████████ ██████████████████████ was all material information to the Patent Office in determining whether to grant the Cottrell's '917 soft-tie patent. Had this information been disclosed to the Patent Office, Cottrell's patent application would have been rejected.

108.    Due to Cottrell's failure to disclose this material information, the '917 soft-tie patent was granted February 3, 2009. But Cottrell was fully aware that its '917 soft-tie patent had been acquired through fraud, and was invalid and unenforceable.

Alleging Infringement of the '917 Soft Tie Patent in Bad Faith

109.    On November 2, 2015, Cottrell sent a cease and desist letter to Boydstun demanding that Boydstun immediately stop advertising, manufacturing, and selling car haulers using a sliding spool feature in its soft-tie down system.

110.    At the time that it sent its letter, Cottrell knew that its assertion of infringement of the '917 soft-tie patent against Plaintiff was without merit because Cottrell had obtained the '917 patent through fraud on the Patent Office, it had not invented the devices claimed, and its application was for Rob Boydstun's invention.

111.    Nevertheless, Cottrell threatened to sue Plaintiff for infringement of Cottrell's fraudulently obtained '917 soft-tie patent.

112.    Cottrell demanded that Plaintiff "immediately cease advertising, promoting, manufacturing and selling car-haul equipment" that violated the fraudulently obtained '917 soft-tie patent and demanded a response within 15 days. Plaintiff responded with a thorough explanation of Boydstun's prior invention.

113.    To date, Cottrell has never responded and has failed to withdraw its demand, thereby maintaining its threat for the last eighteen months.

The '140 Patent

114.    Cottrell applied for its '140 ratcheting-winch patent on March 27, 2008, and sought an expedited review of its application through an accelerated examination.

115.    Under the requirements for accelerated examination, a patent applicant has increased duties of disclosure. Specifically, a patent applicant has to perform a pre-examination search and disclose the search logic to the Patent Office.

116.    While Cottrell purported to conduct this pre-examination search and explain its search methodology to the Patent Office, Cottrell cited only two prior art references, one of which was U.S. Pat. Pub. No. 2006/0013667 to Bu Qin Ruan ("Ruan"). Cottrell did not, however, tell the Patent Office about Cottrell's own patent, U.S. Pat. No. 5,314,275, (Cottrell '275 patent) for a winch mounted on a commercial car hauler.

117.    Instead of disclosing its own highly pertinent winch patent, Cottrell misdirected the Patent Office by identifying a much less relevant patent, U.S. Patent No. 5,101,537 to David S. Cummings. The patent to Cummings does not disclose a large external pawl like the claimed invention or the Cottrell '275 patent—it discloses a very different mechanism for a winch.

118.    It is, and was at the time the application was pending, readily apparent that the '140 ratcheting-winch patent is invalid over Ruan in view of Cottrell's own winch patent, the Cottrell '275 patent. Boydstun filed a petition for Inter Partes Review ("IPR") on February 21, 2017. On August 30, 2017, the Patent Trial and Appeal Board ("PTAB") granted institution of the IPR. In granting the IPR it found a reasonable likelihood that Boydstun would prevail in its

assertion that all claims of the '140 patent are obvious over Ruan in view of the Cottrell '275 patent.

119.    By under-citing prior art winches that Cottrell knew existed, and failing to cite Cottrell's own prior art patent for the commercial car hauler winch, Cottrell deliberately avoided strenuous examination of its patent applications, failed to satisfy its statutory duty of candor in dealing with the Patent Office, misrepresented facts to the Patent Office through omission, all of which was intended to defraud the Patent Office. Cottrell acted with specific intent to deceive the Patent Office.

120.    Had Cottrell disclosed its own Cottrell '275 winch patent, its application for the '140 ratcheting-winch patent would have been denied.

121.    Cottrell's failure to disclose its own winch patent in the context of Cottrell's heightened duty of disclosure was inequitable, done in bad faith, and renders the claims of the '140 ratcheting-winch patent unenforceable.

122.    Since issuance of the '140 ratcheting-winch patent on September 8, 2009 Cottrell knew that it had an invalid patent that was obtained through fraud.

<u>Alleging Infringement of the '140 Ratchet Winch Patent in Bad Faith</u>

123.    A few months after threatening Boydstun with the '917 soft-tie patent, Cottrell made a new threat against Boydstun.

124.    In February 2016, Boydstun introduced its new Rapid Ratchet™ winch. By using the RapidRatchet™ winch, a Driver of a commercial car hauler can more quickly and efficiently tie-down a vehicle in the same way that a ratcheting socket wrench is quicker and easier than a crescent wrench. By rocking a bar up and down, the Driver can tighten a strap around the wheel without having to remove and replace the bar into the ratchet head every quarter turn.

125.     The RapidRatchet$^{TM}$ winch is superior to Cottrell's QuiXspinz® winch. For example, the Rapid Ratchet$^{TM}$ winch rotates more easily and smoothly. It has a quick release pawl, which allows the Driver to quickly release the strap and its design reduces the potential that a tie-down bar will contact and dent a car. The rotation of a Rapid Ratchet$^{TM}$ winch can be easily reversed to accommodate a left-handed person. The RapidRatchet$^{TM}$ winch uses fewer parts and can be easily disassembled and repaired by a Driver. In contrast, corresponding repairs of Cottrell's QuiXspinz® winch often require a shop mechanic.

126.     The above-mentioned differences in the two winches are well-known in the industry.

127.     Boydstun has been offering the Rapid Ratchet™ winch for sale since February 2016. To date, Boydstun has manufactured and sold approximately forty (40) model 9107 transporters with the Rapid Ratchet™ winch.

128.     On March 31, 2016, Cottrell sent Boydstun a demand letter threating Boydstun with Cottrell's '140 ratcheting-winch patent. Cottrell asserted that Boydstun was advertising, manufacturing, and selling car haulers having a Rapid Ratchet$^{TM}$ winch that infringed Cottrell's '140 ratcheting-winch patent.

129.     The March 31, 2016 letter states in part:

> It has come to our attention that you are advertising, manfacturing, and selling car-haul equipment with a "new Rapid Ratchet winch" that infringes Cottrell's '140 Patent. The information on your website at http://boydstun.com/whats-new/ demonstrates that your "Rapid Ratchet winch" infringes at least claims 1 and 8 of the '140 Patent. Cottrell demands that you immediately cease advertising, promoting, manufacturing, selling, or installing the "Rapid Ratchet winch" as part of, or for use with, any car-haul or cargo trailers. Cottrell also demands that you cease such activities for any similar ratcheting tie down systems that violate Cottrell's '140 Patent.

> Cottrell hopes that this matter may be resolved without the need for litigation.

Accordingly, we look forward to your agreement by **April 15, 2016** to immediately cease and desist as requested above. If no agreement is reached by April 15, 2016, or if Cottrell learns that you continue to infringe the '140 Patent after that date, Cottrell reserves the right to pursue all available remedies, including past damages.

130.     On April 11, 2016, counsel for Boydstun responded with an explanation of why

the Rapid Ratchet^TM winch does not infringe the '140 ratcheting-winch patent.

131.     In its second letter, dated April 18, 2016, counsel for Cottrell continued to insist

that the Rapid Ratchet^TM winch infringed the '140 ratcheting-winch patent:

Thank you for your letter of April 11, 2016. Your letter asserts that Boydstun Equipment Manufacturing, LLC ("Boydstun") does not infringe U.S. Patent No. 7,585,140 ("the '140 Patent") owned by Cottrell, Inc. ("Cottrell"). We disagree.

From the video on Boydstun's website reference in my March 31, 2016 letter, Boydstun's "Rapid Ratchet" has a ratchet head "coupled to" and "in mechanical contact" with the ratchet gear as recited in claim 1 of the '140 Patent. The video also shows that the components are "coupled" in a manner to rotate together in a forward direction and separately in a reverse direction as recited in claim 1 of the '140 Patent. Similarly, the video shows a shaft configured to receive at least one of a chain and a strap as recited in claim 8 of the '140 Patent.

Nothing in your April 11 letter causes Cottrell to re-think its allegations that Boydstun infringes at least claims 1 and 8 in light of the above-mentioned video. Instead, your arguments appear to rely on an overly-narrow interpretation of claim 1 of the '140 Patent. There is no requirement for "spring-loaded pins" to accomplish any "mechanical contact" in claim 1 of the '140 Patent. That feature is introduced in dependent claim 2. Features from a dependent claim may not be read into the broader independent like claim 1 as your letter attempts. Claim 8 depends directly from claim 1 and also does not contain the "spring-loaded pins" feature noted in your letter.

If Boydstun is willing to provide any evidence to support its arguments that claims 1 or 8 are not met despite the above-reference video, we will of course be happy to consider it. Absent such evidence, Cottrell reiterates its demand that you immediately cease advertising, promoting, manufacturing, selling, or installing the "Rapid Ratchet winch" as part of, or for use with, any car-haul or cargo trailers. Cottrell remains hopeful that this matter can be resolved amicably, without the need for litigation. Accordingly, we look forward to Boydstun's immediate agreement to cease and desist.

132.     At the time the March 31 letter was sent, Cottrell knew that its infringement threat

against Boydstun was fraudulent for two reasons: (1) Cottrell had no idea whether the Rapid

Ratchet[TM] winch actually infringed any claim of the '140 ratcheting-winch patent; and (2) Cottrell knew it had obtained the '140 ratcheting-winch patent by fraud on the Patent Office.

133.    Cottrell's threats of patent infringement were clear and definitive. Citing the video available on Boydstun' website, Cottrell's March 31 letter asserted "The information on your website at http://boydstun.com/whats-new/ demonstrates that your "Rapid Ratchet winch" infringes at least claims 1 and 8 of the '140 Patent." In its April 18 letter Cottrell rejected the possibility that the Rapid Ratchet[TM] winch did not infringe. Cottrell's April 18, 2016 letter reasserted that "Boydstun infringes at least claims 1 and 8" of the '140 ratcheting-winch patent .

134.    While it made these unqualified charges of infringement, Cottrell was fully aware that it could not ascertain whether the Rapid Ratchet[TM] winch infringed without seeing the interior workings of the winch.

135.    Cottrell later admitted its inability to successfully advance its patent infringement claim. On October 28, 2016—almost seven full months after the initial cease and desist letter was issued—Cottrell provided a sworn declaration to the Court stating that "Cottrell is currently unable to allege a claim against Boydstun for patent infringement."

136.    In fact, Boydstun's use, manufacture, offer for sale and sale of a transporter with Rapid Ratchet™ winches installed, does not infringe either directly, or indirectly, by inducing or contributing to the infringement of, any claim of the '140 patent either literally or under the doctrine of equivalents.

137.    Recently, after having inspected a Rapid Ratchet[TM] winch, counsel for Cottrell called counsel for Boydstun and stated that he agreed that the Rapid Ratchet[TM] winch did not infringe the '140 ratcheting-winch patent.

138.    Despite knowing that it had no idea whether the Rapid Ratchet<sup>TM</sup> winch infringed the '140 ratcheting-winch patent, Cottrell demanded that Boydstun "immediately" stop advertising, manufacturing, and selling car haulers with the Rapid Ratchet<sup>TM</sup> winch, or any similar ratcheting tie-down system, with the intent of using the threat of an expensive lawsuit, without giving thought to or relying upon the outcome of that lawsuit, if Boydstun did not immediately capitulate to Cottrell's demands.

139.    Cottrell's bad faith threat was made to intimidate Boydstun into giving up use of its lawful manufacture and sale of the Rapid Ratchet<sup>TM</sup> winch, which, had Plaintiff done that, would have forced Plaintiff to sell an inferior product and effectively neutralize Plaintiff's competitive threat to Cottrell in the relevant market.

140.    Cottrell made its threat for the specific purposes of undermining Boydstun's ability to compete with Cottrell and interfering with Boydstun's actual and potential customers.

141.    By making its threat, Cottrell intended to undermine and/or drive out of business one of the few if not the only entity that poses any competitive threat to Cottrell's monopoly for the purpose of maintaining its monopoly in the commercial car hauler sales market.

142.    Cottrell's litigation threats are part of a common design and plan to intimidate Boydstun and its other competitors into not using the advanced soft-tie and winch systems and weaken their ability to compete with Cottrell by offering by offering fewer product choices and designs that are or may not be the customers' first choice.    Cottrell's purpose and intent of its patent applications for the '917 and '140 patents was not to protect true innovation.  Cottrell's purpose and intent was to leverage its invalid patents, obtain a means by which it could unlawfully threaten competitors, stifle competition, and maintain its monopoly in the commercial

car hauler sales market. The actions against Boydstun are not new; other manufacturers have had the same experience with Cottrell.

143.    In the less than the one year that Miller was competing in the commercial car hauler market, Miller received a cease and desist letter from Cottrell alleging infringement of Cottrell's '917 soft-tie patent and threatening an infringement action against Miller.

144.    AutoMax is a small company that competes with Cottrell for the sales of commercial car haulers in the United States and was another victim of Cottrell's threats. AutoMax is owned by Paul Lugo.

145.    Paul Lugo is an engineer and has worked in the commercial car hauler market in the United States for thirty (30) years.

146.   In 2012, AutoMax entered into the commercial car hauler market as a new company.  ██████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████

147.   ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████

148.   █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████

149. ████████████████████████████████████████████

████████████████████████████ Cottrell issued a cease and desist letter to Automax alleging

infringement of the '917 soft-tie patent.

150. █████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

███████████████████████████

151. █████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

152.    Even though Paul Lugo believed that AutoMax was doing nothing wrong,

AutoMax opted to stop using the sliding spool feature of its soft-tie system because it could not

afford the expense of a legal battle with Cottrell on the infringement claim.

153. ████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████

154.    The cease and desist letter, the actions thereafter, and the resolution resulted in a

delay in developing the commercial car hauler that AutoMax had worked on for over two years

and impeded AutoMax's ability to compete in the relevant market for a period thereafter.

Scare the Customer and Run Tactics

155.    The Cottrell strategy and conduct also includes a scare-the-customer-and-run tactic that is intended to interfere with Boydstun's business relationships with actual and potential customers and intimidate customers into buying commercial car haulers only from Cottrell.

156.    The threat of an infringement action against Boydstun or any other manufacturer is effectively making the same threat to any Fleet Owner or Owner-Operator that chooses to buy Boydstun's product. The threat does not need to be made directly to a Fleet Owners or Owner-Operator because Fleet Owners and Owner Operators know that to buy a commercial car hauler from Boydstun puts them in a position of compromising their future relationship with Cottrell and opens them to the potential of expensive infringement litigation.

157.    The commercial car hauler sales market and the transportation market are small. Market participants know and are on familiar terms with each other. Word of Cottrell's threats, actions, and results are well-known in the commercial car hauler manufacturing and transportation markets, including Cottrell's threats against AutoMax and Miller. The Fleet Owners and Owner-Operators are also well-aware of the success of Cottrell's threats.

158.    Cottrell issued three cease and desist letters in the space of six months:  one to Boydstun in November of 2015, one to AutoMax in November of 2015, and another to Boydstun in March of 2016. Boydstun's growth in market share stopped and plateaued in 2016.

159.    Word of mouth is not the only means or opportunity by which Cottrell communicates with competitors and customers.  Cottrell's representatives meet regularly with representatives of its customers individually. Cottrell's representatives also meet with its customers and competitors at industry meetings.  These meetings, which are sponsored by Auto

Haulers Association of America ("AHAA"), provide the opportunity and are, in fact, intended to bring industry participants and competitors, together to talk about the industry and learn what is occurring in their markets from each other.

160.    In one such industry meeting in November of 2015, Cottrell and its customer representatives gathered to field customer complaints about Cottrell's products, which led to an airing of a number of customer complaints regarding those Cottrell's products.

161.    The latest meeting sponsored by the AHAA was May 8 through 10, 2017.

162.    The number of Fleets is also small enough, in combination with the familiarity among competitors and customers, to where Cottrell can effectively monitor customers' buying patterns. Customers are well-aware of Cottrell's ability to monitor their purchases in the market.

163.    Cottrell's motive and purpose is to cast doubt on Boydstun's product and its ability to remain in the market. The cloud over Boydstun's products created by Cottrell's actions directed at Boydstun significantly deters Fleets and Owner Operators from making a $300,000 investment in a commercial car hauler manufactured by Boydstun. Cottrell's actions against AutoMax and Miller add to the cloud and customers must calculate whether Boydstun will survive Cottrell's latest acts of intimidation thereby creating additional disincentive to invest in a Boydstun product.

164.    Boydstun was encouraged by certain customers to enter into the market to restore competition to the market.  Boydstun's entry into the market was well-received by a number of market participants.  However, the same customers that encouraged or thereafter supported Boydstun's return to the market have purchased few, if any, commercial car haulers from Boydstun, and have continued to give most or all of their business to Cottrell.

165.    Three of the four largest Fleet Owners, representing up to 50% of the United States sale, had purchased large orders of commercial car haulers from Boydstun as Boydstun Metals Works on a regular basis.  These Fleet Owners are familiar with Boydstun's expertise and the quality of his product.

166.    However, since Boydstun entered the market in 2014, none of the major Fleet Owners have purchased a single commercial car hauler from Plaintiff, nor have any of these Fleet Owners solicited bids from Boydstun to compare with Cottrell's bids on commercial car hauler orders.

167.    West Coast Enterprise is a large and influential Dealer in the commercial car hauler market.  It is located in California and is currently a Cottrell dealer of commercial car haulers.   West Coast Enterprise used to sell a significant number of Boydstun Metal Works' commercial car haulers when Boydstun Metal Works was in the market.

168.    In December of 2016, Boydstun was in contact with West Coast Enterprises and discussed whether West Coast Enterprises would agree to be a dealer for Boydstun.  The owner that West Coast Enterprises thanked Boydstun for entering the market but then told him she could not display, show, or sell any of Boydstun's equipment because, in doing so, West Coast Enterprises would lose its Cottrell business.

<u>Supply Chain Restrictions</u>

169.    Among the Dealers that sell Cottrell commercial car haulers are Jake's Trucks based in Chester Springs, Pennsylvania, TEC Equipment based in Portland, Oregon, Universal Leasing based in Henderson, Colorado, and West Coast Enterprises.

170.    These dealerships are *defacto* Cottrell exclusive dealerships in the relevant product market, thus denying Cottrell's competitors the opportunity to showcase, display, and

sell their commercial car haulers to end users.  The inability to place product at Dealers and enjoy dealer marketing decreases visibility of the manufacturers' products, undermines their ability to gain a foothold in the market and compete with Cottrell, results in less information about competitive products in the market, and further results in and/or threatens to result in fewer sales of commercial car haulers that compete with Cottrell.

171.    In the past several years, Dealers that sell Cottrell commercial car carriers have turned down opportunities to sell commercial car haulers that compete with Cottrell.

172.    Jake's Trucks, West Coast Enterprise, TEC Equipment, and Universal Leasing are all Cottrell dealers. ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████████

173.    ██████████████████████████████████████████████
██████████████████████████████████

174.    ██████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████

175.    ██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████

176. ██████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████

177. ██████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████

178. ██████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████

179. ██████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
██████████████

180. ██████████████████████████████
██████████████████████████████████████████████



181.    The inability to obtain a dealer has impeded and delayed ███████████ in the market because, among other reasons, increased visibility of the manufacturer's vehicles in the market, and increased experience with a particular commercial car hauler facilitates a manufacturer's success.

182.    █████████████████████████

<u>Interference with Suppliers</u>

183.    Western Star is one of three major manufacturers of truck chassis that are used to build commercial car haulers.

184.    Western Star uses dealerships to deliver its truck chassis to commercial car hauler manufacturers.

185.    North Florida Western Star is a large Western Star dealership in the United States which delivers truck chassis to Cottrell.

186.    North Florida Western Star sales manager is Dustin Brigman.

187.    In 2014 and 2015, Rob Boydstun had a number of communications and met with Dustin Brigman.

188.    On or about December 14, 2014, Mr. Brigman visited the Boydstun facility in Clackamas and offered to supply truck chassis to Boydstun.

189.    Mr. Boydstun told Mr. Brigman that Boydstun Equipment would soon be in a position to start taking delivery of truck chassis from Western Star.

190.    Mr. Brigman responded that the dealership would be ready to supply truck chassis to Boydstun when Boydstun was ready to place orders.

191.    Mr. Brigman provided quotes on truck chassis on five occasions (before and after the December 2014 meeting) between July 31, 2014 and May 22, 2015.

192.    On November 14, 2014, Mr. Brigman confirmed that two truck chassis were available for purchase by Boydstun.

193.    In June of 2015, Mr. Brigman offered to facilitate Boydstun's purchase of a Volvo cab.

194.    Later in 2015, Mr. Boydstun called Mr. Brigman to place an order for truck chassis.

195.    Mr. Brigman said he would get back to Mr. Boydstun.  Within hours of the initial call, Mr. Brigman called back and told Mr. Boydstun that the dealership would "have to pass" on taking the order. Mr. Brigman explained that because the dealership delivers truck chassis to Cottrell it could not also deliver its truck chassis to Boydstun because it would be a "conflict of interest."

196.    Mr. Boydstun later related the incident to the President of Western Star who expressed that she was unhappy with the dealership's position because Western Star dealers are required to sell to all buyers.

197.    Then, in 2017, a customer that had been purchasing commercial car haulers from Cottrell directed West Coast Enterprises to redirect several Western Star truck chassis to Boydstun, so that Boydstun could build the commercial car haulers for the customer instead of Cottrell.

198.    North Florida Western Star (the same Western Star dealership that would not deliver truck chassis to Boydstun) is currently engaged in tactics that could delay the delivery of the truck chassis to Boydstun and the completion of the commercial car hauler for the customer.

199.    These problems with North Florida Western Star are occurring because Cottrell controls a substantial amount of North Florida Western Star's business and could retaliate against North Florida Western Star for dealing with Boydstun by directing its business to another Western Star dealer. Upon information and belief North Florida Western Star's behavior in dealing with Boydstun has been caused by threats from Cottrell.

## ANTITRUST INJURY

### Injury to Competition

200.    Cottrell's anticompetitive threats and behavior are having a clear and adverse effect on competition in the market.

201.    Cottrell's actions are intended to unlawfully eliminate head-to-head competition between Cottrell and its competitors, including Boydstun.

202.    Cottrell's actions have restricted its rivals' business independence, foreclosed distribution channels by exercising its market power in the market at issue, forced its rivals to provide fewer choices to its customers and potential customers, and delayed innovation.  These actions impede and delay the rivals' growth (including Boydstun), unlawfully block rivals from

gaining a critical mass of market share to better compete with Cottrell, and restrict the market's maximum output and technical advancement.

203.    Delavan and AutoMax do not influence price, choice, and/or quality of product in the market because of their inability to effectively compete with Cottrell due to Cottrell's exclusionary conduct.

204.    Cottrell has also succeeded in limiting Boydstun's competitive effect in the market by casting doubt, suspicion, and concerns over Boydstun's product and/or the consequences to customers if customers were to buy from Boydstun instead of Cottrell.

205.    Cottrell's unlawful anticompetitive conduct has caused injury to competition in the commercial car hauler sales market by stifling, artificially restraining, and impeding competition on choice of suppliers and products, product quality, supply, innovation, and price.

206.    The Fleets, Owner Operators, and Dealers are denied the benefit of competition on quality, choice, innovation, supply and price and they are forced into having fewer choices of suppliers and designs and features of commercial car haulers.

<u>Antitrust Injury to Boydstun</u>

207.    As a result of Cottrell's unlawful anticompetitive conduct described above, Boydstun has lost sales of commercial car haulers and will continue to lose sales.  Boydstun would have a larger share of the relevant market, but for Cottrell's unlawful conduct.  Fleets and Owner Operators that would otherwise purchase commercial car haulers from Boydstun have instead purchased commercial car haulers from Cottrell and will continue to purchase commercial car haulers from Cottrell as a result of Cottrell's unlawful conduct.  West Coast Enterprises, a Dealer that displayed and showcased Boydstun Metal Works commercial car haulers, will not represent Boydstun Equipment Manufacturing products.

208.    Boydstun's sales of commercial car haulers have plateaued at three percent (3%) of the market in 2016.

209.    Boydstun's damages to date are in the millions of dollars before such damages are trebled.

210.    The exact amount of Boydstun's total damages will be presented at trial.

211.    Cottrell's conduct represents an ongoing threat to competition and further injury to Boydstun in additional lost sales if not enjoined.

212.    Boydstun has been forced to incur litigation costs in this matter to defend its right to use its patented invention, including, but not limited to, attorney fees and expert costs, to enjoin Cottrell from continuing to engage in exclusionary and anticompetitive conduct to unlawfully maintain its monopoly.

## FIRST CLAIM FOR RELIEF

### Non-Infringement of U.S. Patent No. 7,585,140

213.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 212, as though fully set forth herein.

214.    Based on the foregoing communications and the litigation history between the parties, a substantial controversy exists between the parties of sufficient and immediacy and reality to warrant the issuance of a declaratory judgment.

215.    An actual case and justiciable controversy exists between the parties as to Plaintiff's non-infringement of the '140 patent and is within the scope of this Court's jurisdiction pursuant to 28 U.S.C. § 2201.

216.    Plaintiff has appropriately filed for declaratory relief.

217.   Pursuant to the Federal Declaratory Judgment Act, Plaintiff is entitled to a judgment that Plaintiff does not infringe, under any theory of infringement, any claim of the '140 patent.

## SECOND CLAIM FOR RELIEF

### Bad Faith Enforcement of Patents in Violation of ORS § 646A.810

218.   Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 217 above as if fully set forth herein.

219.   Cottrell communicated demands to Plaintiff claiming in bad faith that Boydstun had infringed the '917 and '140 patents.

218.   Cottrell's demands required Plaintiff to respond to the demand within a period of time that a reasonable person would consider to be unreasonably short.

219.   Cottrell's '140 patent demand did not include a statement of facts that would enable a reasonable person to understand Cottrell's basis for asserting infringement.

220.   Prior to its demand, Cottrell failed to compare any of the claims in the '140 patent with Boydstun's Rapid Ratchet$^{TM}$ winch.

221.   At the time Cottrell demanded that Plaintiff immediately cease and desist in alleged infringement of the '140 patent, it had not actually determined that Plaintiff infringed the '140 patent.

222.   Cottrell knew at the time of its '140 patent demand that its claim were without merit. Cottrell knew at the time of its '917 patent demand that its claims were without merit.

## THIRD CLAIM FOR RELIEF

### Monopolization – Sherman Act Section 2

223.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 222 above as if fully set forth herein.

224.    Cottrell has and is unlawfully maintaining its monopoly in the relevant market by willful and exclusionary conduct as stated hereinabove in violation of Section 2 of the Sherman Act.

225.    By engaging in this conduct, Cottrell has gained an artificial competitive advantage and unfairly impeded and impaired its competitors in the commercial car hauler sales market. The purpose and effect of Cottrell's conduct have been to suppress and stifle competition rather than promote competition on the merits.

226.    Cottrell's conduct has suppressed competition by reducing or eliminating choice of products among customers, and by suppressing competition on quality, innovation, and price.

227.    There is no pro-competitive justification for Cottrell's conduct.

228.    Plaintiff has been injured in its business and property by reason of Cottrell's monopolization. Plaintiff's injuries consist of lost sales and lost market share that Plaintiff would have had and gained but for Cottrell's unlawful and anticompetitive conduct.  The injuries are ongoing and damages continue to accumulate.

229.    Plaintiff's injuries and threatened injuries are of the type that the antitrust laws are intended to prevent and flow from that which makes Cottrell's conduct unlawful.

## FOURTH CLAIM FOR RELIEF

### Monopolization – ORS 646.730

230.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 229 above as if fully set forth herein.

231.    Cottrell has and is unlawfully maintaining its monopoly in the relevant market by willful and exclusionary conduct as stated hereinabove in violation of ORS 646.730 of the Oregon Antitrust Act.

232.    By engaging in this conduct, Cottrell has gained an artificial competitive advantage and unfairly impeded and impaired its competitors in the commercial car hauler market. The purpose and effect of Cottrell's conduct have been to suppress and stifle competition rather than promote competition on the merits.

233.    Cottrell's conduct has suppressed competition by reducing or eliminating choice of products among customers, and by suppressing competition on quality, innovation, and price.

234.    There is no pro-competitive justification for Cottrell's conduct.

235.    Plaintiff has been injured in its business and property by reason of Cottrell's monopolization.  Plaintiff's injuries consist of lost sales and lost market share that Plaintiff would have had and gained but for Cottrell's unlawful and anticompetitive conduct.  The injuries are ongoing and damages continue to accumulate.

236.    Plaintiff's injuries and threatened injuries are of the type that the antitrust laws are intended to prevent and flow from that which makes Cottrell's conduct unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Boydstun prays that the Court enter judgment as follows:

(a)    Declaring that Boydstun does not infringe either directly, or indirectly by inducing or contributing to the infringement of, literally or by the doctrine of equivalents, any claim of the '140 patent;

(b)    Declaring that Cottrell and its officers, agents, employees, representatives, counsel, and all persons in active concert or participation with any of them, directly or indirectly, be enjoined from threatening or charging infringement of, or instituting or continuing any action for infringement of the '140 patent against Boydstun, its suppliers, customers, distributors, or users of its products;

(c)    Declaring this case an exceptional case under 35 U.S.C. § 285;

(d)    Granting a judgment for Boydstun against Cottrell for violation of bad faith assertion of its patents under Oregon law;

(e)    That the conduct alleged herein be declared, adjudged and/or decreed to be unlawful under Section 2 of the Sherman Act, 15 U.S.C. § 2;

(f)    That the conduct alleged herein be declared, adjudged and/or decreed to be unlawful under ORS 646.730 of the Oregon Antitrust Act;

(g)    That Plaintiff recover its damages, trebled, in the amount established at trial;

(h)    That Plaintiff recover its costs of the suit, including reasonable attorneys' fees as provided by law; and

(i)    That Plaintiff be granted such other, further, and different relief in law or in equity that this Court deems to be just, equitable and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.


Respectfully submitted,


Dated:  September 1, 2017          JONCUS LAW LLC

                              By:    s/ *Stephen J. Joncus*
                                     **Stephen J. Joncus**, OSB No. 013072
                                     P.O. Box 838
                                     Clackamas, Oregon 97015
                                     917.236.1200
                                     steve@joncus.net

                                     Andrew E. Aubertine, OSB No. 830130
                                     AUBERTINE LAW GROUP PC
                                     7128 SW Gonzaga Street, Suite 230
                                     Portland, Oregon 97223
                                     503.221.2333
                                     aa@aubertinelaw.com

                                     *Attorneys for Plaintiff*
                                     *BOYDSTUN EQUIPMENT MANUFACTURING, LLC*


THIRD AMENDED COMPLAINT – PUBLIC VERSION