# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

**BOYDSTUN EQUIPMENT MANUFACTURING, LLC**, an Oregon limited liability company

Plaintiff,

v.

**COTTRELL, INC.**, a Georgia corporation,

Defendant.

Case No. 3:16-cv-790-SI

**OPINION AND ORDER ON MOTION TO DISMISS**

Stephen J. Joncus, JONCUS LAW PC, 13203 SE 172nd Avenue, Suite 166 #344, Happy Valley, OR 97086; Andrew E. Aubertine, AUBERTINE LAW GROUP PC, 7128 SW Gonzaga Street, Suite 230, Portland, Oregon 97223; Philip S. Van Der Weele, K&L GATES LLP, One SW Columbia Street, Suite 1900, Portland, OR 97258. Of Attorneys for Plaintiff.

Thomas R. Johnson, PERKINS COIE LLP, 1120 NW Couch Street, 10th Floor, Portland, OR; Shylah Alfonso, Ryan J. McBrayer, Cori G. Moore, and Kyle M. Amborn, PERKINS COIE LLP, 1201 Third Avenue, Suite 4900, Seattle, WA 98101-3099; J. Peter Staples and Jack R. Scholz, CHERNOFF VILHAUER LLP, 111 SW Columbia Street, Suite 725, Portland, OR 97201. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff Boydstun Equipment Manufacturing ("Boydstun") brings this action against

Defendant Cottrell, Inc. ("Cottrell"), seeking a declaratory judgment of non-infringement of

Cottrell's U.S. Patent No. 7,585,140 (the "'140 Patent"). Boydstun also asserts a claim of

unlawful monopolization in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and Oregon's equivalent state law, Oregon Revised Statutes ("ORS") § 646.730. Boydstun also alleges bad faith enforcement of patents in violation of ORS § 646A.810. Cottrell moves to dismiss Boydstun's Sherman Act and state-law causes of action for failure to state a claim. ECF 78 (redacted); ECF 81 (unredacted; filed under seal). Cottrell's motion to dismiss is granted in part and denied in part as set forth below. Cottrell also requests judicial notice. ECF 79. That request is granted.

## STANDARDS

### A. Motion to Dismiss

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## B. Monopolization

Section 2 of the Sherman Act prohibits monopolization, attempts to monopolize, and conspiracies to monopolize. 15 U.S.C. § 2. To state a civil claim of monopolization under Section 2, an antitrust plaintiff must allege: "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (quoting *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp LP*, 592 F.3d 991, 998 (9th Cir. 2010)). The offense of monopolization "requires, in addition to the possession of monopoly power in the relevant market, 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Verizon Commc'ns., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Id.* (emphasis in original). The conduct element involves "the use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125

F.3d 1195, 1208 (9th Cir. 1997)) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482-83 (1992)).[1]

## BACKGROUND

The following facts come largely from the Third Amended Complaint (ECF 77) ("Complaint"). The alleged relevant product market is the manufacture and sale of commercial car haulers. The relevant geographic market is the United States. Boydstun and Cottrell are competitors in the relevant market. Commercial car haulers, of which there are about fifteen thousand currently in use in the United States, are used to transport throughout the country up to ten automobiles, with one car often riding above another. Nearby drivers may wonder just how all of those cars remain in place. The answer, in part, is the subject of this lawsuit.

### A.  The Commercial Car Haulers Industry

Boydstun has participated in the relevant market since late 2014. Boydstun's founder and President, Rob Boydstun, previously also was involved in the business of making and selling commercial car haulers as founder and President of Boydstun Metal Works. Boydstun Metal Works manufactured and sold commercial car haulers from 1989 until 2009, when that company filed for Chapter 7 bankruptcy protection.[2] At the urging of former and prospective customers

---

[1] The text of Oregon's anti-monopolization law, ORS 646.730, is virtually identical to Section 2 of the Sherman Act, 15 U.S.C. § 2. In addition, the Oregon Legislature has directed that "[t]he decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority in the construction of ORS [646.730]." ORS 646.715(2). *See also Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 n. 4 (9th Cir. 1999) ("The Oregon antitrust statutes are almost identical to the federal antitrust statutes," and "Oregon courts look to federal antitrust decisions for 'persuasive' guidance in interpreting the state antitrust laws."); *Willamette Dental Group, P.C. v. Oregon Dental Services Corp.*, 130 Or. App. 487, 492 (1994) ("[W]e look to federal decisions interpreting section 2 of the Sherman Act for persuasive, albeit not binding, guidance.").

[2] Cottrell requests that the Court take judicial notice of the fact that Boydstun Metal Works filed for bankruptcy protection in the U.S. Bankruptcy Court for the District of Oregon. ECF 79. Boydstun does not object. Although district courts generally may not consider material

who wanted increased choices and competition in the market, Rob Boydstun re-entered the business in late 2014 with Boydstun Equipment Manufacturing. By the end of 2015, Boydstun had sold about 50 commercial car haulers. That reflects approximately three percent of the market based on annual sales.

Cottrell has been in the business of making and selling commercial car haulers to customers in the United States for several decades. Twenty five years ago, there were at least ten manufacturers of car haulers in the market, including Cottrell and Boydstun Metal Works. In 1996, Cottrell acquired Bankhead Manufacturing, one of Cottrell's primary competitors. At the time of this acquisition, Boydstun Metal Works had a market share of between ten and fifteen percent. By 2008, Cottrell's market share was approximately 50 percent, and the market share of Boydstun Metal Works was approximately 45 percent. Boydstun Metal Works left the market in 2009, leaving Cottrell to be almost the only supplier of commercial car haulers in the country. As of 2010, and at all times relevant to this lawsuit, Cottrell holds a market share of approximately 95 percent.

To build a commercial car hauler, manufacturers like Boydstun and Cottrell first obtain "truck chassis"—essentially a frame—from truck chassis manufacturers. This occurs in one of two ways. First, a truck chassis may be purchased from a chassis dealer and promptly delivered to the car hauler manufacturer. Alternatively, a truck chassis may be purchased from a chassis dealer but held by the dealer and only sent to the car hauler manufacturer when needed. After

---

beyond the pleadings in ruling on a Rule 12(b)(6) motion, they may take judicial notice of documents referenced in the complaint, pleadings from other relevant proceedings, as well as undisputed matters in the public record, without converting a motion to dismiss into one for summary judgment. *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007). Cottrell's request for judicial notice is granted.

receiving a chassis, car hauler manufacturers, like Boydstun and Cottrell, customize the chassis by building and attaching the car hauler trailer to the chassis.

Commercial car haulers generally are sold and distributed to customers through dealers. Dealers showcase, market, and promote the car haulers made by manufacturers, typically receiving compensation in return for a sale. Commercial car haulers are sold primarily to two types of customers: larger transport companies that use their own fleet of commercial car haulers ("Fleet Owners"), or smaller companies that own and drive one or more commercial car haulers ("Owner-Operators"). Owner-Operators can work either independently or with a Fleet Owner.

A commercial car hauler can sell for up to $300,000. They are part of a $260 million per year industry. In the three years comprising 2014, 2015, and 2016, approximately 2,000 commercial car haulers were made and sold in the United States.

**B. Relevant Patents**

The process of converting a truck chassis to a commercial car hauler involves specialized components that are built into the chassis and trailer and are part of the commercial car hauler design. Some of these components involve patented features. Two components of commercial car haulers relevant to this case are a tie-down component for fastening cars and a ratcheting winch for use in the tie-down system.

**1. The '917 Patent**

The first Cottrell patent relevant to the parties' dispute is U.S. Patent Number 7,484,917 ("'917 Patent" or "Cottrell soft-tie patent"). On May 17, 2005, Cottrell filed a provisional application for a "Strap Tie Down Apparatus and System"—which would become the '917 Patent.[3] Eight days later, May 25, 2005, Boydstun Metal Works filed a utility application,[4] titled

---

[3] Provisional applications are non-public.

"Vehicle Support and Retention System for a Vehicle Transporter." Cottrell filed its utility application on January 18, 2006. On October 3, 2006, the U.S. Patent and Trademark Office ("PTO") issued the Boydstun Metal Works soft-tie patent, U.S. Pat. No. 7,114,897, ("'897 Patent"). On February 3, 2009, the PTO issued the Cottrell soft-tie patent, the '917 Patent.

On the same day that the PTO issued the Boydstun Metal Works soft-tie patent ('897 Patent), and while Cottrell was still prosecuting its '917 Patent, Boydstun Metal Works sued Cottrell for infringement of the '897 Patent, alleging that the subject of the '917 Patent infringed on Boydstun Metal Works' '897 Patent. The parties ultimately settled that dispute, and Cottrell acquired, as part of the settlement, a license to the Boydstun Metal Works soft-tie patent (the '897 Patent) as well as another patent held by Boydstun Metal Works.

After Boydstun entered the market in 2014, it began selling its own soft-tie system with a sliding spool. On November 2, 2015, Cottrell sent a cease and desist letter to Boydstun, demanding that Boydstun stop advertising, manufacturing, and selling commercial car haulers with a sliding spool feature in the soft-tie system. Cottrell threatened to sue Boydstun for infringement of the '917 Patent. Boydstun responded that Cottrell's '917 Patent was invalid. Cottrell neither replied to Boydstun's responsive letter nor withdrew its original cease and desist demand.

### 2. The '140 Patent

The second patent relevant to this dispute is the Cottrell '140 Patent ("ratcheting winch patent").[5] Cottrell applied for the '140 Patent for a ratcheting winch on March 27, 2008, seeking

---

[4] A utility patent application is a non-provisional application.

[5] Boydstun seeks a declaratory judgment of non-infringement of the '140 Patent, but that request is not part of Cottrell's pending motion to dismiss. The patent dispute, however, is relevant to Boydstun's claims of monopolization and bad faith enforcement of patents.

expedited review by the PTO.[6] In its application, Cottrell cited two prior art references: U.S. Patent. Pub. No. 2006/0013667, to Bu Qin Ruan ("Ruan"), and U.S. Patent No. 5,101,537, to David S. Cummings. Cottrell's '140 ratcheting winch patent issued on September 8, 2009.

In February 2016, Boydstun introduced its Rapid Ratchet™ winch, which helps drivers more quickly and easily tie down vehicles. On previous models, drivers had to remove a tie-down bar with each quarter-turn of a ratchet. The Rapid Ratchet™ winch allows drivers to insert the tie-down bar just once to tighten the straps enough to secure a vehicle. On March 31, 2016, Cottrell sent Boydstun a demand letter, asserting that Boydstun's Rapid Ratchet™ winch infringed on Cottrell's '140 Patent. In its letter, Cottrell explained that it based its assertion on information available on Boydstun's website. After Boydstun responded, asserting its belief that the Rapid Ratchet™ winch did not infringe the '140 Patent, Cottrell further explained that its infringement allegation was based in part on viewing a video available on Boydstun's website.

On February 21, 2017, Boydstun filed a petition for *Inter Partes* Review ("IPR") with the U.S. Patent Trial and Appeal Board ("PTAB"), asserting that all claims in Cottrell's '140 Patent are obvious over Ruan and one of Cottrell's own prior patents, U.S. Patent No. 5,314,275 ("'275 patent"). Boydstun also asserted that the claims of the '140 Patent are obvious over Ruan and U.S. Patent No. US 6,824,121. On August 30, 2017, the PTAB granted the petition on both grounds and instituted an IPR proceeding, after finding a reasonable likelihood that Boydstun would prevail in at least some of its claims.[7] *Boydstun Equip. Mfg., LLC*, 2017 WL 3835954 (Aug. 30, 2017).

---

[6] Under an expedited review, patent applicants have higher duties of disclosure and must perform a pre-examination search, disclosing the search logic to the PTO.

[7] Neither party objects to the Court taking judicial notice of the PTAB decision for purposes of this motion.

**DISCUSSION**

Boydstun alleges that Cottrell has monopoly power in the U.S. market for commercial car haulers, which Plaintiff and Defendant agree is the relevant market; Cottrell does not dispute that fact for purposes of this motion. Boydstun also alleges that Cottrell has engaged in exclusionary conduct, including bad faith enforcement of patents, "scare-the–customer-and-run" tactics, supply chain restrictions, and interference with suppliers. Boydstun further alleges that it has suffered antitrust injury. Cottrell moves to dismiss Boydstun's monopolization claims on the grounds that: (1) based on the *Noerr-Pennington* doctrine of antitrust immunity, Cottrell is not subject to antitrust liability for enforcing its patents;[8] (2) Boydstun fails to allege sufficient facts to show other exclusionary conduct; and (3) Boydstun fails sufficiently to allege causal antitrust injury. Boydstun responds that Cottrell's conduct is subject to both the "sham" and "*Walker Process* fraud"[9] exceptions to *Noerr-Pennington* immunity and that Boydstun has alleged sufficient facts to show other exclusionary conduct and antitrust injury. Cottrell also moves to dismiss Boydstun's state claim under ORS § 646A.810, arguing preemption under federal law. Boydstun responds that this claim is not preempted because Cottrell engaged in objectively baseless patent enforcement conduct.

**A. Monopolization**

**1. Cottrell's Patent Enforcement Practices**

Boydstun alleges that Cottrell acted in bad faith in enforcing two invalid patents and that Cottrell is now using those patents to block and attempt to block Boydstun's ability to compete

---

[8] The *Noerr-Pennington* doctrine derives its name from two cases, *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).

[9] The *Walker Process* fraud exception comes from *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965).

with Cottrell by threatening to bring patent infringement actions against Boydstun based on invalid patents. Specifically, Boydstun alleges that Cottrell's threatened enforcement of the '917 Patent and the '140 Patent was done in bad faith and constitutes anticompetitive conduct.

### a. *Noerr-Pennington* Immunity

Patent law and antitrust law are at odds. "The point of antitrust law is to encourage competitive markets to promote consumer welfare. The point of patent law is to grant limited monopolies as a way of encouraging innovation." *F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223, 2238 (2013). A patent, in essence, "provides an exception to the antitrust law, and the scope of the patent . . . forms the zone within which the patent holder may operate without facing antitrust liability." *Id.*

"Under the *Noerr-Pennington* doctrine . . . defendants are immune from antitrust liability for engaging in conduct (including litigation) aimed at influencing decisionmaking by the government." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1757 (2014). This includes patent infringement litigation. *See Handargds, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 993 (9th Cir. 1979) ("Patentees must be permitted to test the validity of their patents in court through actions against alleged infringers."). The Ninth Circuit has extended *Noerr-Pennington* immunity to "litigation-related activities preliminary to the formal filing of the litigation," such as presuit demand letters and other "conduct incidental to prosecution of the suit." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934-37 (9th Cir. 2006). Plaintiff and Defendant do not dispute that Cottrell's actions, in sending cease and desist letters and threatening patent infringement litigation, constitute conduct within the *prima facie* scope of the *Noerr-Pennington* doctrine.

There are, however, exceptions to *Noerr-Pennington* immunity. First, under the "sham exception," "activity ostensibly directed toward influencing government action does not qualify

for *Noerr* immunity if it is a mere sham to cover an attempt to interfere directly with the business relationships of a competitor." *Octane Fitness*, 134 S. Ct. at 1757 (quotation marks and alterations omitted). Second, under the "*Walker Process* fraud exception," enforcement of a patent obtained by fraud on the PTO is not entitled to *Noerr-Pennington* immunity. Boydstun argues that both the sham exception and the *Walker Process* fraud exception apply, and, thus, Cottrell may be subject to antitrust liability based on its patent enforcement actions.

b. **The Sham Exception**

"[W]hile genuine petitioning is immune from antitrust liability, sham petitioning is not." *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 525-26 (2002). A bad faith patent enforcement may form the basis for antitrust liability under Section 2. In order "to qualify as a 'sham,' a lawsuit must be objectively baseless and must conceal an attempt to interfere directly with the business relationships of a competitor." *Octane Fitness*, 134 S. Ct. at 1757 (quotation marks and alterations omitted). The Supreme Court has articulated a two-part definition of sham antitrust litigation:

> [F]irst, it "must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits"; second, the litigant's subjective motivation must "conceal an attempt to interfere *directly* with the business relationships of a competitor through the use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon."

*BE & K*, 536 U.S. at 526 (quoting *Prof'l Real Estate Inv'rs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993)) (emphasis in original) (first alteration added, original alterations omitted). "For a suit to violate the antitrust laws . . . it must be a sham *both* objectively and subjectively." *Id.* (emphasis in original). Therefore, "an objectively reasonable effort to litigate cannot be a sham regardless of subjective intent." *Prof'l Real Estate Inv'rs.*, 508 U.S. at 57.

### i. Cottrell's '140 Patent

On March 31, 2016, and again on April 18, 2016, Cottrell sent to Boydstun two cease and desist letters, threatening to sue Boydstun for infringement of the '140 Patent. Boydstun alleges that both letters were objectively and subjectively baseless. Thus, according to Boydstun, Cottrell's sending of these letters falls under the sham exception to *Noerr-Pennington* and subjects Cottrell to antitrust liability.

Boydstun offers several arguments that Cottrell's actions were *objectively* baseless. First, at the time it sent the cease and desist letters, Cottrell had no idea whether the Rapid Ratchet™ winch infringed the '140 Patent. Boydstun alleges that Cottrell was fully aware that it could not ascertain whether the Rapid Ratchet™ winch infringed without seeing the interior workings of the winch. This assertion, however, is belied by the text of Cottrell's letters themselves, which Boydstun incorporates into its Complaint. Cottrell explained in its demand letter dated March 31, 2016, that it based its allegations on information available on Boydstun's website. In its second letter, dated April 18, 2016, Cottrell further explained that it had reviewed a video on Boydstun's website that showed the Rapid Ratchet™ winch to have a ratchet head "coupled to" and "in mechanical contact" with the ratchet gear—using language from Claim 1 of Cottrell's '140 Patent. Cottrell further stated that the video showed the components to be "coupled" together in a way that allowed them to rotate together both forward and in reverse—again using language from the '140 Patent. Finally, Cottrell noted that the video revealed "a shaft configured to receive at least one of a chain and a strap as recited in claim 8" of the '140 Patent. Far from indicating that Cottrell had no idea whether the Rapid Ratchet™ winch actually infringed, or that Cottrell was fully aware that it could not ascertain whether it infringed without seeing its inner workings, these letters, at least facially, suggest that Cottrell believed that it was able to—and had—concluded that Boydstun's Rapid Ratchet™ winch infringed on Cottrell's '140 Patent.

In alternative support of Boydstun's argument that Cottrell's demand letters were objectively baseless, Boydstun also alleges that Cottrell later "admitted" its inability successfully to advance its patent infringement claim when, on October 28, 2016, Cottrell filed a declaration in this case stating that "Cottrell is currently unable to allege a claim against Boydstun for patent infringement." ECF 77 at 25, ¶ 135. Boydstun also alleges that "[r]ecently, after having inspected a Rapid Ratchet™ winch, counsel for Cottrell called counsel for Boydstun and stated that he agreed that the Rapid Ratchet™ winch did not infringe the '140 ratcheting-winch patent." ECF 77 at 25, ¶ 137. These facts, however, are largely irrelevant. Cottrell's declaration stated that—as of October 28, 2016—it was unable to make a claim of patent infringement. This statement, which Boydstun points out was made nearly seven months after Cottrell sent its first demand letter, says little about whether, seven months earlier, Cottrell had an objectively reasonable basis for sending a demand letter. Similarly, what Cottrell's counsel may have concluded after finally inspecting the winch says little about whether, at some earlier time, and before inspection, it was objectively unreasonable for Cottrell to assert its belief that the winch infringed the '140 Patent.

Boydstun has not alleged sufficient facts from which the Court reasonably may infer that Cottrell's two cease and desist letters regarding the '140 Patent were "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" at the time that the letters were sent. *BE & K*, 536 U.S. at 526 (quoting *Prof'l Real Estate Inv'rs.*, 508 U.S. at 60-61) (alterations omitted). Because Boydstun has not sufficiently alleged that Cottrell's enforcement actions with respect to the '140 Patent were *objectively* baseless, the Court need not assess Boydstun's further argument that the claims also were *subjectively* baseless.

## ii. Cottrell's '917 Patent

Boydstun also alleges that Cottrell's cease and desist letter dated November 2, 2015 regarding Cottrell's '917 Patent was sent in bad faith. Boydstun's Complaint alleges:

> At the time that it sent its letter, Cottrell knew that its assertion of infringement of the '917 soft-tie patent against Plaintiff was without merit because Cottrell had obtained the '917 patent through fraud on the Patent Office, it had not invented the devices claimed, and its application was for Rob Boydstun's invention.

ECF 77 at 20, ¶ 100. Boydstun does not, however, expressly allege that this letter was either objectively or subjectively baseless, although it does allege that Cottrell knew its assertion of infringement to be "without merit."

The allegation that Cottrell obtained the '917 Patent through fraud is a legal conclusion that the Court need not accept as true. *Iqbal*, 556 U.S. at 678-79. Boydstun's allegations that Cottrell "had not invented the devices claimed" and that Cottrell's patent covered "Rob Boydstun's invention," without more, do not support the conclusion that the November 2nd demand letter was either objectively or subjectively baseless. In essence, Boydstun is alleging that the demand letter was meritless or "baseless" *because* of the alleged fraud in obtaining the patent. This conflates the two exceptions to *Noerr-Pennington* immunity—the sham exception and *Walker Process* fraud. Boydstun, however, cites no support for the suggestion that fraud on the PTO can itself result in litigation or threatened litigation being labeled a "sham" under the *Noerr-Pennington* doctrine.[10]

---

[10] *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1071 (Fed. Cir. 1998) ("*PRE* and *Walker Process* provide alternative legal grounds on which a patentee may be stripped of its immunity from the antitrust laws . . . [and] we need not find a way to merge these decisions. Each provides its own basis for depriving a patent owner of immunity from the antitrust laws . . . The Supreme Court saw no need to merge these two separate lines of cases and neither do we.").

### c. *Walker Process* Fraud

The Supreme Court found in *Walker Process* "that enforcement of a fraudulently obtained patent claim could violate the Sherman Act." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455 (1993); *see also California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 512-13 (1972) ("Use of a patent obtained by fraud to exclude a competitor from the market may involve a violation of the antitrust laws, as we held in [*Walker Process*]."). Boydstun alleges that both the '140 Patent and '917 Patent were obtained through fraud on the PTO, and thus Cottrell is not entitled to immunity with respect to its enforcement actions for either.

To state a claim of fraud on the PTO, Boydstun must first meet the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) applies to all allegations, or averments, of fraud in all civil cases in federal court, even when fraud is not an essential element of the claim. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-05 (9th Cir. 2003). The Federal Circuit explained in *Medimmune, Inc. v. Genentech, Inc.* that "[l]ike all fraud-based claims, *Walker Process* allegations are subject to the pleading requirements of Fed. R. Civ. P. 9(b)." 427 F.3d 958, 967 (Fed. Cir. 2005), *rev'd and remanded on other grounds*, 549 U.S. 118 (2007) (citing *Vess*, 317 F.3d at 1103-04). Further, the Federal Circuit applies its "own law, not the law of the regional circuit, to the question of whether inequitable conduct has been pleaded with particularity under Rule 9(b)," *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326 (Fed. Cir. 2009), because it "pertains to or is unique to patent law," *Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347, 1356 (Fed. Cir. 2007) (quotation marks omitted). Although the Federal Circuit has not explicitly held that Federal Circuit law also applies to the question of whether *Walker Process* fraud has adequately been pled under Rule 9(b), the Court concludes that Federal Circuit law would—and

should—apply because claims of *Walker Process* fraud "pertain to or are unique to patent law." *Cent. Admixture*, 482 F.3d at 1356 (quotation marks omitted).

Rule 9(b) requires that a plaintiff alleging fraud identify "the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen*, 575 F.3d at 1327; *see also In re BP Lubricants USA Inc.*, 637 F.3d 1307, 1311 (Fed. Cir. 2011) ("*Exergen*'s pleading requirements apply to all claims under Rule 9(b), not just inequitable conduct cases."). The elements of "malice, intent, knowledge, and other conditions of mind of a person may be averred generally." Fed. R. Civ. P. 9(b); *see also Exergen*, 575 F.3d at 1327. But, a plaintiff must still "allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind." *Exergen*, 575 F.3d at 1327.[11]

The question of "whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is to be decided as a question of Federal Circuit law." *Nobelpharma AB v. Implant Innovations*, 141 F.3d 1059, 1068 (Fed. Cir. 1998); *see also Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed. Cir. 2007) ("The first barrier for a *Walker Process* claimant to clear is the requirement that the patent be obtained through actual

---

[11] Similarly, in the Ninth Circuit, "[t]o satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)); *see also Juniper Networks, Inc. v. Shipley*, 643 F.3d 1346, 1350 (Fed. Cir. 2011) ("Rule 9(b) requires a plaintiff to plead in detail 'the specific who, what, when, where, and how' of the alleged fraud.'") (quoting *BP Lubricants*, 637 F.3d at 1309. The Ninth Circuit "has interpreted Rule 9(b) to require that allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Neubronner v. Milken*, 6 F.3d 666, 671-72 (9th Cir. 1993) (quotation marks omitted); *see also Gottreich v. San Francisco Investment Corp.*, 552 F.2d 866, 866 (9th Cir. 1977) ("[A] pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations.") (quotation marks omitted).

fraud upon the PTO. This question is governed by Federal Circuit law."). In order to make out a *Walker Process* fraud claim, an "antitrust-plaintiff must show . . . that the antitrust-defendant obtained the patent by knowing and willful fraud on the patent office and maintained and enforced the patent with knowledge of the fraudulent procurement." *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016).

Thus, a *Walker Process* plaintiff must allege both materiality and a clear intent to deceive. *Nobelpharma*, 141 F.3d at 1069-70. The materiality standard "requires that the patent would not have issued but for the patent examiner's justifiable reliance on the patentee's misrepresentation or omission." *Dippin' Dots*, 476 F.3d at 1347. "*Walker Process* intent may be inferred from the facts and circumstances of a case . . . ." *Id.* "[O]missions, as well as misrepresentations, may in limited circumstances support a finding of *Walker Process* fraud." *Nobelpharma*, 141 F.3d at 1070. But, "'[a] mere failure to cite a reference to the PTO will not suffice'" to establish *Walker Process* fraudulent intent. *Dippin Dots*, 476 F.3d at 1347 (alteration in original) (quoting *Nobelpharma*, 141 F.3d at 1071). In order "to find a prosecution omission fraudulent there must be evidence of intent separable from the simple fact of the omission." *Id.*[12]

### i. Cottrell's '140 Patent

Boydstun alleges that Cottrell's '140 Patent was obtained through fraud because Cottrell failed to disclose to the PTO a highly relevant patent of its own during the prosecution of the '140 Patent. On March 27, 2008, Cottrell applied for what was ultimately issued as the '140 Patent, and sought expedited review. Under 37 C.F.R. § 1.56, patent applicants have "a duty of

---

[12] In *Dippin' Dots*, the Federal Circuit noted that "[i]t might be argued that because [an] omitted reference was so important to patentability, [the applicant] must have known of its importance and must have made a conscious decision not to disclose it." 476 F.3d at 1348. The court noted that while "[t]hat argument has some force," it cannot sustain a finding of *Walker Process* fraud. *Id.* Rather, deceptive intent must be shown "independently." *Id.*

candor and good faith in dealing with the [PTO], which includes a duty to disclose to the [PTO]

all information known to that individual to be material to patentability as defined in [§ 1.56]."[13]

Under an expedited review process, applicants must provide "an information disclosure

statement (IDS) in compliance with 37 CFR 1.98 citing each reference deemed most closely

related to the subject matter of each of the claims." *Manual of Patent Examining Procedure*

("*MPEP*") 708.02(a).[14] In its application, Cottrell submitted two prior art references: U.S. Pat.

Pub. No. 2006/0013667 to Ruan; and U.S. Patent No. 5,101,537 to David S. Cummings.

Boydstun alleges that Cottrell's '275 patent, which Cottrell did not disclose, was highly

pertinent to Cottrell's application for the '140 Patent—far more so than the Cummings patent,

which Cottrell did disclose. Boydstun specifically explains that the Cummings patent "does not

disclose a large external pawl like the claimed invention or the Cottrell '275 patent—it discloses

a very different mechanism for a winch." ECF 77 at 21, ¶ 117. Boydstun also alleges that "[i]t is,

and was at the time the application was pending, readily apparent that the '140 ratcheting-winch

patent is invalid over Ruan in view of Cottrell's own winch patent, the Cottrell '275 patent." *Id.*

¶ 118. This assertion is supported by the fact that PTAB recently granted Boydstun's petition for

---

[13] As stated in 37 C.F.R. § 1.56(b), "[u]nder this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or (2) It refutes, or is inconsistent with, a position the applicant takes in: (i) Opposing an argument of unpatentability relied on by the Office, or (ii) Asserting an argument of patentability."

[14] According to 37 C.F.R. § 1.155 (2015) ("Expedited examination of design applications"), applicants "must have conducted a preexamination search" and a request for expedited review must include "[a] statement that a preexamination search was conducted."

IPR, finding a reasonable likelihood that Boydstun would prevail in challenging Cottrell's '140 Patent on this ground.[15]

Boydstun pleads sufficient facts to satisfy the Rule 9(b) pleading standard in the context of an omission. Cottrell argues that *Exergen Corp. v. Wal-Mart Stores, Inc.*, requires that Boydstun allege fraud with greater specificity, including alleging who was obligated to disclose the prior art. 575 F.3d 1312 (Fed. Cir. 2009). *Exergen*, however, involved a request for leave to amend pleadings after trial in an inequitable conduct case.[16] The Federal Circuit concluded in that case that the proposed post-trial pleading insufficiently alleged inequitable conduct under Rule 9(b). Specifically, the plaintiff had failed to "name the specific individual associated with the filing or prosecution of the application . . . who both knew of the material information and deliberately withheld or misrepresented it." *Id.* at 1329. By that stage of proceedings in *Exergen*, the parties had already completed both discovery and a trial on the merits. Thus, it was reasonable to expect that the plaintiffs should have been able to allege who, specifically, committed the alleged inequitable conduct.

In contrast, Boydstun has not had the benefit of discovery, let alone trial. To expect that Boydstun would be able to allege which person at Cottrell was responsible for the patent application is unreasonable. At this stage of the lawsuit, Boydstun has adequately alleged what information was withheld by Cottrell from the PTO, when and in what context it was withheld,

---

[15] Cottrell also suggests that its '275 patent may have been cumulative and it would have had no obligation to disclose prior art that was cumulative of that which it had already disclosed. Cottrell argues in its motion to dismiss that Boydstun was required to, but did not, allege that Cottrell's '275 patent was not cumulative. Boydstun, however, alleges that Cottrell's '275 patent was highly relevant to the patent being sought and that Cummings was entirely unlike either. This is sufficient to allege that Cottrell's '275 Patent was not cumulative.

[16] As the Federal Circuit explained in *Exergen*, "[i]nequitable conduct, while a broader concept than fraud, must be pled with particularity under Rule 9(b)." *Exergen*, 575 F.3d at 1326 (quotation marks omitted).

and why the omission was both relevant and false or misleading. In the context of an alleged fraudulent omission,[17] where the allegation is that *no one acted*, this is sufficient to meet the pleading requirements of Rule 9(b).[18]

Boydstun's pleading also satisfies the fraudulent intent element of a *Walker Process* claim. Although "[a] mere failure to cite a reference to the PTO will not suffice" to establish *Walker Process* intent, Boydstun alleges more than a mere failure to cite to its own patent. Boydstun alleges that Cottrell knew of the other, more relevant patent (since it was Cottrell's own patent), that Cottrell instead disclosed a far less relevant prior art patent along with the Ruan patent, and that it was readily apparent at the time that Cottrell's '140 Patent was obvious over the Ruan patent in view of Cottrell's '275 patent. Boydstun alleges that this was done with an intent to deceive the patent office.

Boydstun further alleges that if Cottrell had disclosed its '275 Patent, Cottrell's '140 Patent would not have issued. Boydstun alleges specific facts about the Cummings prior art that explain why Cottrell's '275 patent was more relevant. Further, the sufficiency of Boydstun's

---

[17] In the context of an omission, there is reason to believe that the 9(b) pleading standard takes a slightly different, less strict form. *See In re Premera Blue Cross Customer Data Security Breach Litigation*, 198 F. Supp. 3d 1183, 1194 (D. Or. 2016); *In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *35 (N.D. Cal. May 27, 2016) (discussing Rule 9(b) in the context of an alleged fraudulent omission).

[18] This reading of *Exergen* also comports with the Federal Circuit's own *Walker Process* case law. *Exergen* was an inequitable conduct case, and although the Federal Circuit has stated that Rule 9(b) applies in the *Walker Process* context, it has not yet applied *Exergen* to a *Walker Process* fraud claim. The Court finds no indication in the Federal Circuit's *Walker Process* case law that it is insufficient to allege that a party, rather than a specific individual, fraudulently omitted information that the applicant was obligated to disclose. *See Hydril Co. LP v. Grant Prideco LP*, 474 F.3d 1344, 1346 (Fed. Cir. 2007) (finding that a *Walker Process* claimant alleging that the defendant company, Grant Prideco, concealed prior art from the PTO sufficiently alleged a *Walker Process* claim). In fact, in the *Walker Process* opinion itself, the U.S. Supreme Court explained that "Walker's counterclaim alleged that *Food Machinery* obtained the patent by knowingly and willfully misrepresenting facts to the Patent Office." *Walker Process*, 382 U.S. at 177 (emphasis added).

allegations also is supported by the fact that the PTO granted IPR, tentatively concluding that the '140 prior art was obvious over Ruan and the '275 patent.

In *Hydril Co. LP v. Grant Prideco LP*, the Federal Circuit reversed a lower court's dismissal of an antitrust claim alleging *Walker Process* fraud. 474 F.3d 1344 (Fed. Cir. 2007). As the Federal Circuit explained:

> Hydril's complaint alleged that Grant Prideco had fraudulently obtained its '631 patent by "fail[ing] to disclose to the USPTO material prior art of which [it] was aware" (which the complaint described) and that "[t]he '631 Patent as issued would not have been granted to Grant Prideco had Grant Prideco not omitted from its disclosures such known information on the prior art." If Hydril can prove these allegations, they would ground a claim of monopolization in violation of § 2 of the Sherman Act because they "would be sufficient to strip [Grant Prideco] of its exemption from the antitrust laws" its patent would otherwise provide.

*Hydril Co.*, 474 F.3d at 1349 (alterations in original) (quoting *Walker Process*, 382 U.S. at 177). The Federal Circuit concluded that "[u]nder [its] precedent, the conduct alleged in Hydril's complaint would constitute *Walker Process* fraud." *Id.* (citing *Nobelpharma*, 141 F.3d at 1070).

*Hydril* is persuasive with respect to the question before the Court. Cottrell argues that *Hydril* is factually distinguishable, but the Court is unpersuaded. The factual differences between the allegations in *Hydril* and in this case are irrelevant in view of *Hydril*'s holding. Boydstun alleges that Cottrell failed to disclose to the PTO material prior art, that Cottrell was aware of this prior art at the time of its application, and that Cottrell's '140 Patent would not have been granted if the prior art had been disclosed. Under *Hydril*, if Boydstun "can prove these allegations, they would ground a claim of monopolization in violation of § 2 of the Sherman Act." *Id.* at 1349. Thus, Boydstun has alleged sufficient facts to state a claim of *Walker Process* fraud with respect to the prosecution of Cottrell's '140 Patent, and may be subject to antitrust liability for its enforcement of that patent.

### ii. Cottrell's '917 Patent

Boydstun also alleges *Walker Process* fraud on the PTO based on the prosecution of

Cottrell's '917 Patent. On May 17, 2005, Cottrell filed a provisional (and non-public) application

for a patent on its soft-tie system. Eight days later, Boydstun Metal Works filed a utility

application for its own soft-tie system. Boydstun Metal Works' soft-tie patent ('897) issued on

October 3, 2006, and on that day Boydstun Metal Works sued Cottrell for infringement of that

patent. Between October 2006 and December 2007, Boydstun Metal Works and Cottrell were

involved in litigation over Boydstun Metal Works' infringement claim. Boydstun alleges that

during the litigation, Cottrell learned through discovery that Boydstun Metal Works was in fact

the first to invent the soft-tie technology in question. Boydstun further alleges that Boydstun

Metal Works' soft-tie patent covers essentially the same scope as Cottrell's '917 patent—an

allegation of which Cottrell certainly was aware, since it formed the basis of Boydstun Metal

Works' suit. During the pendency of that litigation, Cottrell continued to prosecute what later

became Cottrell's '917 Patent.

Boydstun alleges that Cottrell failed to disclose the following relevant and material

information to the PTO during Cottrell's prosecution of the '917 patent: the existence of

Boydstun Metal Works' soft-tie patent; prior art listed on Boydstun's soft-tie patent; information

that Cottrell had about Boydstun Metal Works' earlier invention of the soft-tie system; the patent

infringement suit brought by Boydstun Metal Works and the settlement thereof; and Cottrell's

acquisition of a license to Boydstun's patent in the settlement agreement.

Cottrell argues that it was under no obligation to disclose the existence of the ongoing

litigation in the patent prosecution process. The existence of litigation involving the subject

matter of a patent being prosecuted, however, is relevant to the application. The *MPEP* provides

that:

> Where the subject matter for which a patent is being sought is or
> has been involved in litigation, the existence of such litigation and
> any other material information arising therefrom must be brought
> to the attention of the U.S. Patent and Trademark Office. Examples
> of such material information include evidence of possible prior
> public use or sales, questions of inventorship, prior art, allegations
> of "fraud," "inequitable conduct," and "violation of duty of
> disclosure."

*MPEP* 2001.06(c)(1994); *see also Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120

F.3d 1253, 1258 (Fed. Cir. 1997) ("There seems little doubt that the litigation involving the

patent in question would be relevant to its reissue proceeding."); *DaimlerChrysler AG v. Fueling*

*Advanced Techs*., Inc., 276 F. Supp. 2d 1054, 1061 (S.D. Cal. 2003) (quoting same).[19]

Cottrell also argues that because Boydstun's '897 Patent application was filed after

Cottrell's '917 application, Boydstun's '897 Patent was *later* art, not *prior* art, and thus Cottrell

was under no obligation to disclose it. But if Cottrell knew, as Boydstun alleges, that Cottrell

was not in fact the first to invent the technology for which it sought a patent, that would be

information material to the PTO's decision of whether to grant a patent to Cottrell—regardless of

whether Boydstun's patent application came before or after Cottrell's. *See MPEP*

2001.06(c)(1994) (listing "questions of inventorship" and "prior art" as material information).

As with Cottrell's '140 Patent, Boydstun has met the Rule 9(b) standard. Boydstun

alleges with particularity what was concealed from the PTO, when and in what context, and how

---

[19] Cottrell responds that the cases Boydstun cites for the proposition that litigation
involving the subject matter of a patent application must be disclosed say nothing about a
requirement to disclose litigation regarding patents outside the "patent family" at issue. Cottrell
is correct that *DaimlerChrysler*, for example, involved a prosecution of a continuation-in-part
patent and undisclosed litigation about a parent patent. But *DaimlerChrysler* does not suggest
that the litigation was relevant only because it involved a patent in the same family. It stands to
reason that patents in the same family are highly relevant to one another; but patents outside the
family may be as well, as Boydstun alleges here. Furthermore, the discussion in the *MPEP* that
explains that the existence of litigation over the "subject matter for which a patent is being
sought" must be disclosed to the PTO provides no such distinction or limitation. *See*
*MPEP* 2001.06(c) (1994).

the withheld information was relevant to Cottrell's patent application. *Walker Process* fraudulent intent also is adequately alleged. While Cottrell was prosecuting its '917 Patent, it was defending a lawsuit by Boydstun Metal Works regarding the subject matter of that patent, yet did not disclose this to the PTO. Cottrell also knew of Boydstun Metal Works' claim that Cottrell's proposed patent infringed on Boydstun's patent. Boydstun also alleges that Cottrell knew that Boydstun Metal Works had invented the soft-tie technology before Cottrell's alleged invention of the '917 patented system. When Boydstun specifically asked Cottrell during the litigation about its prior invention, Cottrell did not provide a substantive response. When Boydstun asked Cottrell during the litigation to describe its history of conception and design of the soft-tie system, Cottrell also did not do so, other than to provide the date of a constructive reduction to practice. These facts also support Boydstun's allegation that "Cottrell knew that it did not invent the subject matter of the '917 Patent and that it had copied the soft-tie design from Boydstun." Yet, Cottrell did not disclose this to the PTO.

Boydstun also alleges that all of this information was material to the PTO's determination in whether to grant the '917 Patent. Specifically, Boydstun alleges that had this information been disclosed to the Patent Office, Cottrell's patent application would have been rejected. These allegations are sufficient to state a claim of *Walker Process* fraud on the PTO. *See Hydril Co*., 474 F.3d at 1349. Therefore, Cottrell may be subject to antitrust liability for its patent enforcement actions relating to its '917 Patent.

### 2. Other Monopolization Tactics

In addition to Cottrell allegedly attempting to enforce invalid patents, Boydstun alleges that Cottrell engaged in several other forms of exclusionary conduct. In evaluating these claims, the Court examines whether Boydstun's Complaint alleges "the use of monopoly power 'to

foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Image Tech. Servs., Inc.*, 125 F.3d at 1208 (quoting *Eastman Kodak Co.*, 504 U.S. at 482-83).

### a. "Scare-the-Customer-and-Run Tactics"

Boydstun alleges that Cottrell's exclusionary conduct also includes a "scare-the-customer-and-run tactic that is intended to interfere with Boydstun's business relationships with actual and potential customers and intimidate customers into buying commercial car haulers only from Cottrell." ECF 77 at 29, ¶ 155. Boydstun also alleges that "Cottrell's motive and purpose is to cast doubt on Boydstun's product and its ability to remain in the market" and that Cottrell's "actions directed at Boydstun" create a "cloud over Boydstun's products" that deters potential customers. *Id.* ¶ 163.

Boydstun's customer interference theory relies entirely on Cottrell's patent enforcement actions. As Boydstun explains, the market for commercial car haulers is small, and the key players are relatively few. Boydstun asserts that Cottrell's threats and actions are well-known in the market, including, specifically, Cottrell's threats against other companies, such as AutoMax and Miller, which consisted of sending cease and desist letters. Boydstun alleges that Fleet Owners and Owner-Operators are well-aware of the "success" of Cottrell's threats of patent litigation—*i.e.*, that threats from Cottrell effectively deter other car hauler manufacturers from participating in the market or from offering products they otherwise would. Boydstun specifically points to three cease and desist letters issued to Cottrell's competitors between November 2015 and March 2016.

Boydstun does not allege that Cottrell has directly threatened or improperly influenced any *customers*. Rather, Boydstun claims that "[t]he threat of an infringement action against Boydstun or any other manufacturer is effectively making the same threat to any Fleet Owner or Owner-Operator that chooses to buy Boydstun's product." ECF 77 at 29, ¶ 156. Boydstun asserts

that the Fleet Owners and Owner-Operators fear that buying a commercial car hauler from Boydstun will compromise their future relationship with Cottrell and possibly expose them to expensive infringement litigation.

In addition, as Boydstun suggests, customers may have an incentive to buy from companies that they believe are likely to remain in the market—particularly when buying large, expensive machinery, such as commercial car haulers. The concern that a manufacturer could be forced out of the market may serve as a "disincentive to invest" in that manufacturers' product. Cottrell asserts that Boydstun has not expressly alleged that Cottrell publicized its patent enforcement actions, told customers about them, or otherwise worked to ensure that customers were aware of them. Boydstun does not dispute this assertion. Rather, Boydstun alleges that, because the market for commercial car haulers is small and tight-knit, no such publication is necessary in order for customers to be aware of patent enforcement activities. Boydstun's allegation is a reasonable inference that must be drawn in favor of Boydstun at this stage of the proceedings.

But even to the extent that customers may be concerned over Cottrell's threats to its competitors, that effect derives solely from Cottrell's patent enforcement activities. Boydstun alleges that Cottrell's representatives meet regularly with representatives of Cottrell's customers individually and at industry meetings. Boydstun, however, does not allege that Cottrell threatened, intimidated, or otherwise improperly attempted to influence customers during those meetings. Boydstun also alleges that because of the small size of the market, Cottrell is capable of monitoring customers' buying patterns, and customers understand that Cottrell has this capability. Although this may be true, Boydstun does not allege facts sufficient to suggest that Cottrell actually used that monitoring ability improperly to influence consumers.

The only element of Boydstun's alleged consumer interference theory that is unrelated to Cottrell's patent enforcement activities is that customers "know" that buying "from Boydstun puts them in a position of compromising their future relationship with Cottrell." ECF 77 at 29, ¶156. Boydstun also alleges that it has not received requests or orders from customers who previously indicated a willingness to buy from Boydstun, and that it generally has not received the levels of business that it expected. Boydstun argues that this does not make economic sense and asks the Court to infer from these alleged facts that Cottrell has invoked its market power to dictate consumers' buying decision. These vague allegations, however, are unsupported by facts alleging any anticompetitive conduct by Cottrell itself with respect to customers, and the inference that Boydstun asks this Court to make is too far removed from the facts alleged to be reasonable.

The remainder of Boydstun's allegations relating to customer interference addresses the alleged injury, or effect, of Cottrell's patent enforcement practices. In short, Boydstun alleges that Cottrell's cease and desist letters, news of which has spread through the small auto-hauler community, have the effect of deterring potential customers. As discussed above, Cottrell may be liable in antitrust for its patent enforcement practices because Boydstun has sufficiently alleged *Walker Process* fraud. Boydstun's allegations that consumers are deterred by Cottrell's exclusionary conduct—in the form of patent enforcement actions—go to the effect, or injury, caused by that exclusionary conduct. Boydstun has not, however, alleged sufficient facts to otherwise state a claim of exclusionary conduct in the form of customer interference.

### b. Restrictions on Dealers

Boydstun also alleges exclusionary conduct in the form of downstream supply chain restrictions. Commercial car haulers are sold through dealers. Boydstun alleges that dealers have refused to sell commercial car haulers manufactured by Boydstun and other Cottrell competitors,

denying them the opportunity to showcase and sell their products to consumers. Specifically, Boydstun alleges that four individual dealerships are *de facto* exclusive Cottrell dealerships: Jake's Trucks in Chester Springs, Pennsylvania; TEC Equipment in Portland, Oregon; Universal Leasing in Henderson, Colorado; and West Coast Enterprises in Fresno, California. Boydstun alleges that each of these dealers was approached by AutoMax, a competitor of Cottrell's, "and/or another company," offering to sell commercial car haulers through these dealers. Each of the dealers declined, and each stated, as a reason for declining the offer, that selling to other manufacturers would jeopardize their business with Cottrell.

Boydstun's Complaint also provides further allegations. In 2013 or 2014, Paul Lugo ("Lugo"), the owner of AutoMax, approached Jake Grow ("Grow"), owner of Jake's Trucks. The two discussed developing a new type of commercial car hauler that Grow would sell to his customers. Lugo and Grow worked for several months on a prototype. After some time, however, Grow told Lugo that a representative of Cottrell had told Grow that if Grow sold car haulers made by AutoMax then Grow would no longer be able to sell Cottrell car haulers. Grow stated that Cottrell gave him a clear warning: if he kept working with AutoMax, he would not be able to sell Cottrell products. After this, Grow and Lugo ended their discussions, and Jake's Trucks does not sell car haulers made by AutoMax.

Boydstun's Complaint alleges a similar story with respect to TEC Equipment and Universal Leasing. In 2015 or 2016, Lugo approached a sales manager with the Autotransport Division of TEC Equipment about selling AutoMax car haulers. TEC's representative was excited about the prospect of working with AutoMax, and the two had several conversations, all of which seemed positive to Lugo. At some point, TEC Equipment's representative called Lugo and told him that TEC Equipment could not promote AutoMax products because doing so

"would jeopardize its relationship with Cottrell." ECF 77 at 33, ¶ 178. Although Boydstun does not explicitly allege that someone from Cottrell told the representative as much, it is a reasonable inference. AutoMax similarly attempted to work with Universal Leasing. A representative of Universal Leasing told Lugo that the company could not work with AutoMax due to concerns that doing so would cause it to lose its supply of Cottrell haulers.

Finally, Boydstun alleges that another (unnamed) car hauler manufacturer that attempted to develop business relationships with West Coast Enterprises and TEC equipment experienced similar treatment and responses. Representatives of each dealer explained that they could not deal with this other manufacturer because they were already selling Cottrell products.

Cottrell characterizes this as an allegation of exclusive dealing and argues that Boydstun has not adequately pled a claim of exclusive dealing in violation of the antitrust laws. Exclusive dealing claims generally arise under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14. When exclusive dealing claims are brought as violations of these provisions, a plaintiff must allege substantial market foreclosure resulting from the arrangement. *See, e.g., Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp., LP*, 592 F.3d 991, 996 (9th Cir. 2010) ("Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits '[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States.' Plaintiffs premise their Section 1 claim on just one theory of liability: exclusive dealing."); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) ("[E]ven though a contract is found to be an exclusive-dealing arrangement, it does not violate the section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected.").

Cottrell argues that, even proceeding under § 2 rather than § 1, monopolization plaintiffs alleging exclusive dealing must plead substantial market foreclosure. In support of this proposition, Cottrell cites a Fourth Circuit case involving a claim of exclusive dealing arising under § 2. *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160 (4th Cir. 2014). In *Kolon*, the Fourth Circuit noted that, under Supreme Court precedent, "an exclusive dealing arrangement does not violate antitrust laws unless its probable effect is to 'foreclose competition in a substantial share of the line of commerce affected.'" *Id*. at 175 (quoting *Tampa Elec. Co.*, 365 U.S. at 327. Cottrell also cites a case from the Northern District of California, which cited *Kolon* for the proposition that "to be actionable under section 2, a monopolist's conduct must foreclose competition . . . ." *Eastman v. Quest Diagnostics Inc.*, 108 F. Supp. 3d 827, 834 (N.D. Cal. 2015). This portion of *Eastman*, while citing *Kolon*, left out the text in *Kolon* indicating that it was speaking only of claimed exclusive dealing arrangements. This difference is important here.

Cottrell is correct that Boydstun does not assert a separate claim of exclusive dealing.[20] The important question, though, is whether Boydstun's allegations sufficiently state a claim for monopolization under Section 2—whether the alleged facts indicate "the use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Image Tech. Servs., Inc*., 125 F.3d at 1208 (quoting *Kodak*, 504 U.S. at 482-83). As Boydstun argues, Cottrell's alleged interference with dealers serves to bolster Boydstun's claim of anticompetitive conduct by Cottrell. Boydstun sufficiently alleges that Cottrell has interfered with the relationships between dealers and manufacturers, and that Cottrell has essentially threatened

---

[20] The parties agree that there is no express precedent in the Ninth Circuit that supports a claim of "*de facto* exclusive dealing." *See generally Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (2016) (noting that the Ninth Circuit has "not explicitly recognized a '*de facto*' exclusive dealing theory" and declining to reach that question).

dealers out of doing business with Cottrell's competitors. This is sufficient to allege the use of monopoly power for anti-competitive purposes.

### c. Interference with Suppliers

Finally, Boydstun alleges that Cottrell's monopolization tactics have included interference with suppliers of truck chassis, which are needed to make commercial car haulers. Boydstun alleges the following facts in support of this claim. North Florida Western Star ("North Florida") is a large dealership that sells and delivers truck chassis to Cottrell. Its manager, Dustin Brigman ("Brigman") spoke with Rob Boydstun on several occasions in 2014 and 2015. On or about December 14, 2014, Brigman visited Boydstun's facility and offered to supply Boydstun with truck chassis. Brigman provided quotes for the chassis on five different occasions between July 31, 2014 and May 22, 2015, and told Rob Boydstun that North Florida would be ready to supply chassis whenever Boydstun was ready to place an order. On November 14, 2014, Brigman confirmed that two truck chassis were available for Boydstun to purchase, and in June 2015 Brigman offered to sell Boydstun a Volvo cab. At some point later in 2015, Rob Boydstun called Brigman, ready to place an order. Brigman said that he would get right back to Rob Boydstun, and within a few hours he called Rob Boydstun and told him that North Florida would have to pass on filling Boydstun's order. Brigman told Rob Boydstun that because North Florida sells truck chassis to Cottrell, North Florida could not also sell truck chassis to Boydstun because to do so would be a "conflict of interest." Later, Rob Boydstun related these facts to the President of Western Star, which oversees several dealerships, including North Florida. The President responded to Rob Boydstun that Western Star dealers are required to sell to "all buyers."

Boydstun also alleges that at some time in 2017, a former Cottrell customer told West Coast Enterprises to redirect several Western Star truck chassis from Cottrell to Boydstun, so

that Boydstun could build commercial car haulers for that customer. Boydstun alleges that after this, North Florida engaged in tactics that jeopardized the timely delivery of the truck chassis to Boydstun and the completion of a commercial car hauler for that customer. Boydstun alleges that this issue with North Florida occurred because of Cottrell's control over North Florida's business, and was caused by threats from Cottrell.

Cottrell argues that Boydstun's allegation of interference with suppliers is vague and speculative. The Court disagrees. As Boydstun alleges, North Florida told Rob Boydstun that supplying to him would be a "conflict of interest." Western Star's President, however, stated that dealerships were required to sell to all sellers, implying that there is no "conflict of interest" that would prohibit North Florida from selling to two different competing manufacturers. Even after being told to supply to Boydstun, North Florida acted in a way that sought to delay the supply of needed chassis to Boydstun. From this, it is a reasonable inference that North Florida knew that Cottrell, its main purchaser, would view unfavorably North Florida selling to Boydstun and would respond accordingly to the detriment of North Florida. Boydstun also specifically alleges that North Florida's behavior was "caused by threats from Cottrell." ECF 77 at 36, ¶199. Truck chassis are an "essential feature of the commercial car hauler," and interfering with a competitor's ability to obtain truck chassis may constitute exclusionary or anticompetitive behavior. Whether and to what extent this is so may depend upon more specific facts and circumstances, but Boydstun's allegations are sufficient at this stage of the proceedings.

### 3. Antitrust Injury

In order to state a claim for unlawful monopolization, in addition to showing unlawful exclusionary conduct, a plaintiff must also adequately allege antitrust injury. Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489. Antitrust injury generally has

four elements: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (quoting *American Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999)). The type of injury that the antitrust laws were intended to prevent is injury to competition. *See Brunswick*, 429 U.S. at 488 ("The antitrust laws . . . were enacted for 'the protection of competition not competitors.'") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) ("[T]he central purpose of the antitrust laws . . . is to preserve competition."). The Ninth Circuit has added a fifth element: "that 'the injured party be a participant in the same market as the alleged malefactors,' meaning 'the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market.'" *Somers*, 729 F.3d at 963 (quoting *Glen Holly Entm't*, 343 F.3d at 1008).

As previously discussed, Boydstun adequately alleges anticompetitive conduct. Specifically, Cottrell's alleged patent enforcement practices, alleged interference with suppliers of truck chassis, and alleged interference with dealers sufficiently allege anticompetitive conduct. Thus, the first antitrust injury factor is met. The Ninth Circuit's fifth antitrust injury factor also is met. Cottrell and Boydstun are competitors in the same market for making and selling commercial car haulers.

The Court next considers the second, third, and fourth factors together. Boydstun alleges that Cottrell's actions have caused consumers who would otherwise buy from Boydstun to buy from Cottrell instead. Cottrell allegedly has deterred dealers from working with Boydstun and selling Boydstun's car haulers. As a result of Cottrell's alleged anticompetitive conduct,

Boydstun has lost sales, revenue, and profit. Further, Boydstun allegedly would have had a larger share of the relevant market but for Cottrell's anticompetitive conduct. Instead, Boydstun alleges that its sales "have plateaued at three percent (3%) of the market in 2016." ECF 77 at 38, ¶ 208. Boydstun also alleges that, as a result of Cottrell's actions, Boydstun has incurred litigation costs in order to assert its right to sell the products it manufactures.[21] Boydstun alleges that its damages, to date, "are in the millions of dollars." ECF 77 at 38, ¶ 209.

Boydstun also alleges that its injuries flow from Cottrell's anticompetitive conduct. Boydstun alleges that Cottrell's interference with suppliers of truck chassis has delayed or hindered its ability to obtain this crucial component to car haulers. Boydstun further alleges that Cottrell's interference with dealers has hindered Boydstun's ability to present its car haulers to consumers in the market. Specifically, Boydstun alleges that this "decreases visibility of the manufacturers' products, undermines their ability to gain a foothold in the market and compete with Cottrell, results in less information about competitive products in the market," and otherwise reduces sales to Cottrell competitors. ECF 77 at 32 ¶ 170. Boydstun also alleges that Cottrell's threats of patent infringement litigation have "scared away" potential customers.

Boydstun alleges that "Cottrell's actions have restricted its rivals' business independence, foreclosed distribution channels . . . forced its rivals to provide fewer choices to its customers and potential customers, and delayed innovation." ECF 77 at 36, ¶ 202. The effect of Cottrell's actions, Boydstun alleges, has been to hinder the growth of Cottrell's competitors and prevent them from gaining market share, and to "restrict the market's maximum output of technical

---

[21] Cottrell argues that, because Boydstun is the plaintiff in this case rather than the defendant, and is seeking a declaratory judgment of non-enforcement of the '140 patent, it may not rely on an allegation of attorney's fees to allege antitrust injury. This distinction does not matter. The costs incurred in responding—in one way or another—to a cease and desist letter are no different in theory from the costs incurred in responding to a lawsuit alleging patent infringement. These costs may differ in quantity, but not quality.

advancement." ECF 77 at 37, ¶ 202. Boydstun further alleges that Cottrell's actions have "cast[]

doubt, suspicion, and concerns over Boydstun's products and/or the consequences to customers"

of buying from Boydstun, which has prevented Boydstun from fully competing in the market.

ECF 77 at 37, ¶ 204. Boydstun also alleges that Cottrell's actions have injured competition by

"stifling, artificially restraining, and impeding competition on choice of suppliers and products,

product quality, supply, innovation, and price." ECF 77 at 37, ¶ 205. As a result, there is less

competition in the market, and fewer choices for consumers.

　　These allegations are sufficient to allege an injury to Boydstun that flows from Cottrell's

alleged unlawful conduct and harms competition. Thus, Boydstun has sufficiently alleged the

second, third, and fourth factors of antitrust injury, as well as the first and fifth factors.

## B.  Bad Faith Enforcement of Patents Under ORS § 646A.810

　　Cottrell also moves to dismiss Boydstun's claim for tortious patent enforcement in

violation of ORS § 646A.810 on the ground that this claim is preempted by federal patent law.

The Federal Circuit's decision in *Globetrotter Software, Inc. v. Elan Computer Group, Inc*.

controls this question.[22] 362 F.3d 1367 (Fed. Cir. 2004).

　　The Federal Circuit explained in *Globetrotter* that "federal patent law preempts state-law

tort liability for a patentholder's good faith conduct in communications asserting infringement of

its patent and warning about potential litigation." *Id*. at 1374. Boydstun's state law claim "can

survive federal preemption only to the extent that [the claim is] based on a showing of bad faith

action in asserting infringement." *Id*. (quotation marks omitted). *Globetrotter* expressly held that

state-law tort liability is permitted "for only objectively baseless allegations of infringement,"

---

[22] As the Federal Circuit noted in *Globetrotter*, "[w]e apply Federal Circuit law not only
to the patent issues [in a case] but also in deciding whether the patent laws preempt a state-law
tort claim." *Globetrotter*, 362 F.3d at 1374 (citing *Midwest Indus., Inc. v. Karavan Trailers, Inc*.,
175 F.3d 1356, 1359 (Fed. Cir. 1999) (*en banc* in relevant part)).

applying the standard from *Professional Real Estate*. *Id.* at 1377. Therefore, "[a] plaintiff claiming that a patent holder has engaged in wrongful conduct by asserting claims of patent infringement must establish that the claims of infringement were objectively baseless." *Id.* Boydstun argues that *Globetrotter* was wrongly decided, and Boydstun has preserved that argument for later appellate review. Boydstun does not contest, however, that this district court is bound by *Globetrotter* and that *Globetrotter* controls the issue of whether Boydstun's state law claim is preempted.

As discussed above regarding *Noerr-Pennington* immunity, Boydstun has not alleged a sufficient factual basis from which the Court can reasonably infer that Cottrell's patent enforcement actions were "objectively baseless." Therefore, Boydstun's claim under ORS § 646A.810 is preempted by federal law. Cottrell's motion to dismiss this claim is granted.

## CONCLUSION

The Court GRANTS IN PART AND DENIES IN PART Cottrell's motion to dismiss. ECF 78 (redacted); ECF 81 (unredacted). Cottrell's motion to dismiss is granted with respect to Boydstun's claim arising under ORS § 646A.810 and denied in all other respects. The Court also GRANTS Cottrell's request for judicial notice. ECF 79.

**IT IS SO ORDERED**.

DATED this 24th day of October, 2017.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge